Dale ROMANN, Appellant,

v.

STATE of Alaska, DEPARTMENT OF TRANSPORTATION AND PUBLIC FACILITIES, Appellee.

No. S–8344.

Supreme Court of Alaska.

Nov. 12, 1999.

Rehearing Denied Dec. 15, 1999.

Peter J. Maassen and William H. Ingaldson, Ingaldson Maassen, P.C., Anchorage, for Appellant.

Elizabeth J. Hickerson, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

BRYNER, Justice.

### I. INTRODUCTION

Dale Romann appeals a superior court order affirming an administrative decision rejecting his lease renewal application and publicly auctioning a new lease of government-owned airport property. He challenges a decision of the Department of Transportation and Public Facilities (DOT) to deny him a lease renewal, as well as its administration of the auction.

We conclude that agency regulations did not entitle Romann to a new lease of the property once his lease had ended. Moreover, we conclude that DOT did not abuse its discretion in failing to favor Romann, its former tenant, in setting the terms of the auction. Accordingly, we affirm.

### II. FACTS AND PROCEEDINGS

Dale Romann's twenty-year lease of state-owned airport property expired on July 1, 1994. About a month before the lease ended, he applied for a renewal. The Lease Application Review Committee for the Anchorage International Airport (Review Committee) reviewed Romann's application and recommended that the lease be extended for ten years. But before the new lease's thirty-day period for public comment had run,[1] another individual, Greg Remaklus, applied to lease the property. The Review Committee determined that both applications met its approval; it rejected both in favor of a public auction. On March 22, 1995, the airport issued an invitation to bid for the lease. Romann remained on the leased property in holdover status.

Romann appealed to DOT, objecting to the fact of the auction and to some of its terms. DOT denied his appeal, as well as his request for reconsideration, because it interpreted its regulations to require a public auction. Romann appealed to the superior court.

1. See 17 Alaska Administrative Code (AAC) 40.320(c)(7).

On March 4, 1996, while Romann's superior court appeal was still pending, the airport put the leasehold up for competitive bid. Romann bid on the lease, but lost to a higher bidder. That same day, he filed another appeal with DOT. After DOT denied this appeal Romann appealed again to the superior court, which consolidated his appeals and eventually affirmed DOT's decisions.

Romann appeals.

## III. DISCUSSION

### A. Standard of Review

 When the superior court acts as an intermediate court of appeal, we independently review its decision.[2] We apply four principal standards of review in administrative appeals:

The "substantial evidence" test is used for questions of fact. The "reasonable basis" test is used for questions of law involving agency expertise. The "substitution of judgment" test is used for questions of law where no expertise is involved. The "reasonable and not arbitrary" test is used for review of administrative regulations.[3]

### B. DOT Reasonably Interpreted Its Regulations to Require a Public Auction upon the Receipt of "Competing Applications."

 Romann first argues that because he applied to renew his lease before DOT received a competing application, he was entitled to an automatic lease renewal under 17 AAC 40.320(c)(1), which provides that certain aviation-related leases "will be granted on a 'first come-first served' basis." This argument requires us to consider the interplay between subsection .320(c)(1) and two other subsections of the same regulation—subsections .320(c)(8)(A) and (c)(8)(C).

By its own terms, subsection .320(c)(1)'s "first come-first served" policy applies only when no other regulation requires a public auction:

A lease or privilege for any activity that is classed as aviation will be granted on a "first come-first served" basis . . . unless law, regulations, or a determination by the department that the best interests of the public will be served require a particular lease or privilege to be offered at public auction or by competitive proposal.[4]

Another subsection of section .320—subsection (c)(8)(C)—requires DOT to hold a public auction if it receives competing lease applications that meet the requirements of yet a third subsection:

If two or more applications meeting the requirements in (A) . . . of this subsection are received for a lease lot of the same class of use . . ., then the lease will be granted under 17 AAC 40.340(d) [governing public auctions].[5]

That third subsection, subsection (c)(8)(A), provides:

If a lease application conforms to the airport master plan, meets all other requirements, and no other objections or conflicting applications are received within the notice period, the lease may be executed.[6]

Applying subsection (c)(8)(A), DOT determined that Romann's and Remaklus's lease applications conformed to the airport's master plan and met all other applicable requirements. And since Remaklus's application had been received before Romann's application was noticed, DOT further determined that both applications fell within the pertinent notice period. But because the applications conflicted by competing for the same lease, subsection (c)(8)(A) did not authorize DOT to execute either. Accordingly, DOT turned to subsection (c)(8)(C). DOT concluded that this subsection required it to conduct a public auction because two individuals who otherwise would have qualified for a lease

---

2. See *Usibelli Coal Mine, Inc. v. State, Dep't of Natural Resources*, 921 P.2d 1134, 1141 (Alaska 1996).

3. *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992) (citing *Jager v. State*, 537 P.2d 1100, 1107 n. 23 (Alaska 1975)).

4. 17 AAC 40.320(c)(1).

5. 17 AAC 40.320(c)(8)(C).

6. 17 AAC 40.320(c)(8)(A).

under subsection (c)(8)(A) had submitted competing, equal-priority applications. Upon concluding that subsection (c)(8)(C) required a public auction, DOT further concluded that subsection (c)(1)'s "first come-first served" policy no longer governed.

On appeal, the superior court rejected the conclusion that subsections .320(c)(8)(A) and (C) required a public auction, finding that DOT's interpretation of these provisions conflicted with their plain meaning. According to the court's logic, subsections (c)(8)(A) and (C), when read together, literally define a null set: subsection (c)(8)(C) expressly requires DOT to hold a public auction only if it receives "two or more applications meeting the requirements in [subsection (c)(8) ](A);"[7] yet subsection (c)(8)(A)'s requirements could only be met "[i]f ... no other ... applications [were] received."[8] According to the superior court's reasoning, since the mere existence of a competing application would preclude an application from complying with subsection (A), there could never be a case under subsection (C) involving "two or more applications meeting the requirements in [subsection] (A)."[9]

Concluding, on this basis, that subsections .320(c)(8)(A) and (C) did not require DOT to hold an auction in Romann's case, the superior court ruled that these subsections did not override the "first come-first served" policy. The court nevertheless upheld DOT's refusal to apply this policy. Relying on subsection (c)(1)'s language that makes the "first come-first served" policy inapplicable upon "a determination by the department that the best interests of the public will be served" by an auction, the court declared that DOT had validly made a best-interests determination in Romann's case.

■ On appeal, Romann disputes the court's finding of a valid best-interests determination. Although the state defends the superior court's finding of a valid best-interests determination, it primarily argues that the superior court should have upheld DOT's interpretation of its own regulation. Contending that the court too rigidly applied the plain meaning of subsections (c)(8)(A) and (C), the state urges us to hold that DOT properly interpreted subsection (c)(8)(C) as requiring an auction, thereby overriding subsection (c)(1)'s "first come-first served" policy. The state argues that an agency's interpretation of its own regulation deserves deference and that DOT's interpretation of section .320 comports with relevant canons of statutory construction, with the regulation's history, and with its underlying policy. We find this argument persuasive.[10]

■ As the state correctly notes, the superior court's literal interpretation is problematic because it overlooks settled rules of statutory interpretation. "Whenever possible, we construe each part or section of a statute with every other part or section, to produce a harmonious whole."[11] And in so doing we assume that every word and phrase in the statute has meaning and must be given effect.[12] In relying on literal interpretation to conclude that competing applications could never meet the requirements of subsection (c)(8)(A), the superior court read that subsection in isolation. And as a result, the court effectively nullified subsection (c)(8)(C)'s language requiring an auction when competing applications meet the requirements of subsection (c)(8)(A). To adopt the superior court's interpretation, we would have to assume that subsection (c)(8)(C)'s reference to subsection (c)(8)(A) is meaningless.

■ Moreover, although the superior court rigorously enforced the regulation's plain meaning, we do not adhere to the plain meaning rule of statutory interpretation. We rely instead on a sliding scale approach even if a statute is plainly worded:

*North Sanitation, Inc. v. Alaska Pub. Utils. Comm'n,* 825 P.2d 867, 869 n. 2 (Alaska 1992).

---

**7.** *See* 17 AAC 40.320(c)(8)(C).

**8.** *See* 17 AAC 40.320(c)(8)(A).

**9.** 17 AAC 40.320(c)(8)(C).

**10.** We may affirm the superior court's decision on any basis appearing in the record. *See Pierce v. Pierce,* 949 P.2d 498, 500 (Alaska 1997); *Far*

**11.** *Benner v. Wichman,* 874 P.2d 949, 957 (Alaska 1994) (citation omitted).

**12.** *See O'Callaghan v. State,* 826 P.2d 1132, 1135 (Alaska 1992).

[S]ince words are necessarily inexact and ambiguity is a relative concept, we ... turn to the legislative history, mindful that the plainer the language, the more convincing contrary legislative history must be.[13]

Section .320's recent history is instructive, revealing that DOT revised its leasing regulations and adopted 17 AAC 40.320(c)(8)(C) in response to a recommendation by the Alaska Ombudsman.[14] In the late 1970s the Ombudsman conducted an investigation into the fairness of DOT's leasing practices, the adequacy of its public notice procedures, and the propriety of its valuation methods for leases of state lands.[15] The investigation, according to the Ombudsman's report, revealed constitutional notice problems that had been ignored by DOT's Division of Aviation.[16] Accordingly, the Ombudsman recommended that "the Division of Aviation immediately afford public notice for all new land leases at Anchorage International [Airport]." [17]

In response to the Ombudsman's recommendations, DOT committed to make certain changes ensuring the legality, fairness, and reasonableness of its leasing practices.[18] Specifically, DOT indicated that it would subject land leases to prior public notice so that "[a]ll [future] agreements will be granted only after prior public notice on an individual basis." [19] Keeping to this commitment, in 1979 DOT adopted 17 AAC 40.320(c)(7), a provision requiring public notice of thirty days before the execution of a lease.[20] It also adopted 17 AAC 40.320(c)(8)(C), the provision at issue here, which mandates a public auction in the event of two or more competing lease applications that meet the requirements of subsection (c)(8)(A). Thus, both subsection (c)(7)'s public notice requirement and subsection (c)(8)(C)'s provision for a competitive lease process appear to have been designed to address the fairness concerns discussed in the Ombudsman's report.

In light of this history—and especially in light of the Ombudsman's finding that "[t]he lack of public notice was unfair to potential competitive lessees as they had no opportunity to bid or negotiate for the lease tracts" [21] —it seems sensible to interpret subsection (c)(8)(C) as DOT did—that is, as a provision requiring a public auction when multiple applicants timely submit competing lease applications, each individually meeting the requirements of subsection (c)(8)(A).

Romann nevertheless argues that this interpretation is flawed because it implies a "nonsensical reading" of 17 AAC 40.320(c)(8)—one that effectively nullifies subsection (c)(1)'s "first come-first served" policy. He maintains that if DOT must hold an auction whenever two or more applicants compete for the same lease, the "first come-first served" regulation would never apply and would therefore be meaningless. Romann thus proposes that it would be more reasonable to construe "conflicting application" under subsection (c)(8)(A) to apply to situations in which one application "truly conflicts" with another because the "first come-first served" doctrine would give preference to neither: "If, for example, DOTPF *validly* determines under subsection (c)(1) that 'first come-first served' should not apply in a particular situation because of law, regulation or 'the best interests of the public' ..., then DOTPF can invite applications." Asserting this view, Romann contends that because his

---

13. *State v. Alex*, 646 P.2d 203, 208–09 n. 4 (Alaska 1982) (quoting *United States v. United States Steel Corp.*, 482 F.2d 439, 444 (7th Cir.1973)) (internal quotations omitted).

14. *See* Second Rep. of the Ombudsman, 1976 at 96–100 (1977).

15. *See id.*

16. *See id.*

17. *Id.* at 98.

18. *See id.*

19. *Id.* at 98–99.

20. 17 AAC 40.320(c)(7) provides:

Public notice as described in 17 AAC 40.340(d)(1) must be completed before a lease is executed. The contract for a lease or privilege may be executed by the department 30 days after the first appearance of the notice. Permits for the temporary use of land or building space for 120 days or less may be granted by the department without public notice.

21. Second Rep. of the Ombudsman at 96.

renewal application gave him priority under the "first come-first served" policy, it actually never conflicted with Remaklus's application in a way that would trigger subsection (c)(8)(C)'s auction requirement.

But Romann's proposed interpretation undermines the regulation's goal of promoting fairness through advance public notice and competitive leasing. As Romann would construe the regulation, any existing tenant would have a right of renewal without competition. In turn, this would render subsection (c)(7)'s notice requirement virtually useless— the notice would rarely do more than inform the public of a leasing decision already made.[22]

Romann is also mistaken in asserting that DOT's interpretation renders the "first come-first served" policy meaningless. Under DOT's reading of subsection (c)(8)(C)'s auction provision, the "first come-first served" policy continues to play a potentially meaningful role that comports with the basic regulatory goals of notice and competitive fairness.

Applying DOT's interpretation, if DOT receives multiple eligible applications during the thirty-day notice period, then subsection (c)(8)(C)'s auction requirement comes into play and overrides the "first come-first served" provision set out in subsection (c)(1). But subsection (c)(8)(C)'s auction provision would not be triggered by applications received after the notice period. Subsection (c)(8)(A) deals only with situations "when no other objections or conflicting applications are received *within the notice period.*" And because DOT reads subsection (c)(8)(C)'s

auction provision to be triggered by a conflict created by competition under subsection (c)(8)(A)—i.e., multiple, conforming applications submitted during the notice period— competition arising after the notice period would not require an auction. In the event of post-notice applications, then, the "first come-first served" policy would presumably operate by default to set priority among applications.

█ From the record currently before us, we cannot determine whether, or how often, post-notice competition of this kind actually arises. But the issue is beside the point. For purposes of resolving the issue in this case, the significant point is that DOT has interpreted its own regulation in a way that is reasonable—at least as reasonable as the interpretation adopted by the superior court or the alternative suggested by Romann. Because DOT "is best able to discern its intent in promulgating the regulation at issue," we must defer to its decision by conducting review under the "reasonable basis" standard.[23] Since we are unable to say that DOT's interpretation of 17 AAC 40.320 lacks a reasonable basis, we uphold its decision to conduct a public auction in this case.[24]

### C. *DOT's Administration of the Public Auction*

█ Romann also contends that DOT treated him unjustly in its administration of the auction. Alaska law provides DOT with broad discretion to conduct public auctions of airport property.[25] We thus review DOT's

---

22. *See* 17 AAC 40.320(c)(8)(D) (requiring that the department "consider all objections to or comments on a proposed lease which are received within the 30–day notice period").

23. *Rose v. Commercial Fisheries Entry Comm'n,* 647 P.2d 154, 161 (Alaska 1982) ("[W]here an agency interprets its own regulation ... a deferential standard of review properly recognizes that the agency is best able to discern its intent in promulgating the regulation....").

24. Because we uphold DOT's decision to deny Romann's application in favor of a public auction of the lease, we need not address the parties' dispute as to whether DOT made a "best inter-

ests" determination that would have independently justified DOT's decision.

Romann argues that DOT's interpretation of its regulations to require a public auction in his case is arbitrary because it contradicts DOT's prior policy of automatically renewing leases for similarly situated applicants, which it consistently applied. But the record does not support Romann's claim. While Romann submitted evidence indicating that DOT has renewed aviation-related leases for numerous other leaseholders, Romann's evidence does not establish that other applicants had filed competing applications within the applicable notice periods.

25. *See* 17 AAC 40.340(d)(3).

actions under the deferential "reasonable basis" standard.[26]

### 1. DOT's refusal to continue Romann's lease in holdover status until the effective date of H.B. 543

■ DOT granted Romann's lease holdover status while the renewal decision was pending. In early 1996 members of the Alaska legislature wrote DOT, requesting it to "hold in abeyance any bid auctions effective immediately, until the legislature [could] take final action on House Bill 543." The letter explained that the proposed law "clarifies the rights of existing tenants to extend their lease terms ... [and the request was issued] so that any existing leases may benefit from the new law." DOT nevertheless publicly auctioned the leasehold on May 8, 1996—while H.B. 543 was still pending. Romann contends that DOT abused its discretion in failing to continue his holdover status until the legislature could enact the new legislation.

We find no merit in this contention. DOT had already permitted Romann holdover status for nearly two years and had already postponed the auction pending its review of airport lease policy. Moreover, DOT had granted Romann holdover status not in recognition of some special, legal right to occupy the leasehold, but merely to ensure efficient use of the property pending DOT's determination of its appropriate disposition. Finally, we note that the legislature itself recognized that its letter seeking postponement was merely a request, albeit an "urgent" one. Romann cites no legal authority that would require DOT to forestall its public auction under these circumstances.

Accordingly, we conclude that DOT did not abuse its discretion in declining further postponement for legislative action.

### 2. DOT's refusal to postpone the auction until after completing its environmental assessment of the lease lot

■ Likewise, we conclude that DOT did not abuse its discretion in refusing to postpone the auction until it completed its environmental assessment of Romann's former lease lot.

■ We recognize that Romann's inability to precisely determine his liability for the environmental conditions of his leasehold might have affected how he bid for the new lease. But Romann himself assumed responsibility for the contamination of the leasehold when he originally entered into the lease. By statute he was strictly liable for any contamination.[27] DOT's environmental assessment would by no means expose Romann to increased liability; it would merely determine the extent of contamination for which he was already liable. Though Romann might have preferred to know in advance what costs he could expect to pay, the agency could reasonably conclude that it had no obligation to delay the auction for his sole benefit.[28]

### 3. DOT's bidding system

DOT permitted bids on lease terms ranging from ten to twenty-five years, depending on the amounts bidders were willing to invest in permanent improvements, with longer lease terms requiring a greater commitment. Ultimately, however, the lease was to go to the qualified bidder offering the largest advance payment—or "bonus bid"—regardless of the lease length sought. Romann contests this bidding process, arguing that by failing to weight bids according to the length of the lease term sought, DOT violated 17 AAC 40.330(a)'s amortization requirement. Romann also argues that the "bonus bid" format violated AS 02.15.090(a)'s uniform-rate requirement.

**26.** See Paul Wholesale v. State, Dep't of Transp. & Pub. Facilities, 908 P.2d 994, 997–98 (Alaska 1995).

**27.** See AS 46.03.822.

**28.** We also reject Romann's related argument that he was entitled to a hearing before DOT terminated his lease. As the superior court observed, DOT never terminated his lease; the lease itself expired. Thus, Romann had no cognizable interest requiring a pre-auction hearing under 17 AAC 40.382.

194

### a. The amortization requirement

■ 17 AAC 40.330(a) requires that a lease term be "of such duration as to allow the lessee ... to amortize and recover the cost of investment during the term of the lease...."[29] DOT's bidding system, Romann argues, violates this regulation by treating unfairly those bidders who, like himself, sought shorter lease terms. He observes, "[T]he up-front amount from a bidder seeking a ten-year term was treated the same as the up-front amount from a bidder seeking a 30–year term."

But even assuming that the bidding process deliberately favored bidders seeking long-term leases, this form of favoritism would reflect a policy choice within the broad discretion that DOT enjoys under 17 AAC 40.330(a). While favoring longer-term leases might result in a lower effective rate and ultimately generate less money for DOT, longer-term leases could very well improve a lessee's chances of "amortiz[ing] and recover[ing] the cost of investment"—the specific concern addressed in 17 AAC 40.330(a).

### b. The uniform-rate requirement

■ Alaska Statute 02.15.090(a) grants DOT discretion to "establish the terms and conditions and fix the charges, rentals, and fees for the privileges or services that are reasonable and uniform for the same class of privilege or service." Romann argues that

29. 17 AAC 40.330(a) provides:

The initial term of lease or permit may be for any period allowed by law and will be determined by the purposes for which the lease or permit is to be granted, its conformance with the master plan for the airport, the amount of investment to be made by the lessee or permittee, and the method and terms of financing the investment. It should be of such duration as to allow the lessee or permittee to amortize and recover the cost of investment during the term of the lease or permit.

30. See AS 02.15.090(a), which provides in part:

In operating an airport or air navigation facility owned or controlled by the state, the department may enter into contracts, leases, and other arrangements covering periods not exceeding 55 years ... granting the privilege of using or improving an airport or air navigation facility or a portion of it or space in it for commercial, governmental, or other public

DOT violated the uniform-rate requirement by mandating that potential lessees pay a "bonus bid" in addition to the uniform rate. But Romann's interpretation of this statute's "reasonable and uniform" language ignores the balance of the provision, which authorizes DOT to charge fees and set rental rates by a "competitively offered contract."[30]

Under its "bonus bid" system, DOT offered the lease to the bidder making the largest bonus payment, regardless of the lease term sought. This allowed every bidder to choose a lease length on which to bid and to make a bonus offer accordingly. Moreover, DOT set the annual rental for the leasehold at six cents per square foot—the same rate as that for similarly situated property. We conclude that DOT's competitive bid procedure falls well within its authority under AS 02.15.090(a).[31]

### 4. DOT's refusal to credit Romann's bid with the value of his existing leasehold improvements

■ Romann also argues that DOT abused its discretion in refusing to credit Romann's auction bid according to the value of his permanent improvements on the leasehold. But he points to no statutory or regulatory authority to support his contention. The parties do not dispute that the existing improvements on the lease lot belonged to Romann. He had already benefitted from

purposes, including private plane tie down.... The department may establish the terms and conditions and fix the charges, rentals, and fees for the privileges or services that are reasonable and uniform for the same class of privilege or service. Charges, rentals, or fees authorized by this subsection may be fixed for the international airports by order of the commissioner or by negotiated or competitively offered contract.... The terms, conditions, charges, rentals, and fees shall be established with due regard to the property and improvements used and the expense of operation to the state.

31. Romann also asserts that DOT, by making various alleged public policy determinations regarding Romann's right to renew his airport lease, violated the Open Meetings Act, AS 44.62.310. But because Romann fails to brief this issue at all, we need not consider it. See Adamson v. University of Alaska, 819 P.2d 886, 889 n. 3 (Alaska 1991).

their use, and since they had been required under Romann's original lease agreement, these improvements had enabled him to occupy the leasehold for the duration of the original lease. Romann thus had no reasonable ground for demanding that his past improvements be credited again toward the requirements of a new lease.

In contrast, DOT could reasonably have decided, as a matter of policy, to disallow credit for prior improvements in order to place all bidders on an equal footing with respect to the new lease. Accordingly DOT did not lack a reasonable basis for disallowing credit.

### 5. *DOT's compliance with bidder qualification and public notice requirements*

 Romann further argues that by failing to award the lease to either Remaklus or himself, DOT violated 17 AAC 40.340(d)(3)'s "qualified bidder" requirement. Romann maintains that he and Remaklus were the only "qualified bidders" since only they had been "qualified" through the Review Committee's established review process.

But DOT had established the Review Committee to implement 17 AAC 40.320(c)(8)'s provisions governing review of lease applications. Subsection (c)(8) does not speak to qualifications to bid at a public auction, a subject addressed in 17 AAC 40.340(d)(3). The latter regulation gives DOT broad discretion to determine qualifications for bidders in each sale it conducts:

> The sale shall be conducted by the department and may be either by sealed bids or public outcry, or both, after the manner determined by the department in each instance to be in the public interest. The sale shall be made to the highest qualified bidder *as determined by the department*.[32]

Here, DOT required all bidders to register before the auction; submit a completed, signed, notarized bidder's affidavit and a bid deposit; and receive a bidder's card. In addition, the sample contract provided non-negotiable conditions and terms for use of the lease lot that had been pre-approved by DOT. There was thus no need for an independent committee review of the lease applications.

 Romann's contention that this method of bidder qualification failed to provide adequate public notice of the proposed lease is likewise meritless. DOT complied with statutory notice requirements for airport lease auctions by providing the public with a summary of all relevant terms and conditions of the auctioned lease.[33] DOT also held a pre-bid conference to allow prospective bidders a further opportunity to review both the proposed terms and conditions of the lease and the procedures governing the auction.

In sum, we hold that DOT acted well within its discretion in conducting the disputed auction.

### IV. *CONCLUSION*

Because we conclude that DOT reasonably construed its regulations to require a public auction in this case and conducted the public auction properly, we AFFIRM its order denying Romann's appeals.

---

**32.** 17 AAC 40.340(d)(3) (emphasis added).

**33.** *See* 17 AAC 40.340(d)(1).