Steven L. HARTUNG, Appellant,

v.

STATE of Alaska, DEPARTMENT
OF LABOR, Tom Cashen,
Commissioner, Appellee.

No. S–8352.

Supreme Court of Alaska.

April 27, 2001.

Stephan H. Williams, Anchorage, for Appellant.

Susan L. Daniels, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

Alaska law allows the state, under certain circumstances, to collect a corporation's unpaid unemployment taxes from the officers of the delinquent corporation. A corporate officer is liable for all payments that become due during a period in which the officer is in a position to behave strategically and effectuate the payments. But where bankruptcy intervenes and removes the corporate officer's power to make the required payments on behalf of the corporation, that officer is not liable for payments that become due during the post-petition period and that the officer could not make because of bankruptcy.

## II. FACTS AND PROCEEDINGS

MarkAir was an air carrier serving Alaska and the West with hubs in Anchorage and Denver. Steven Hartung was MarkAir's chief financial officer during the period relevant to this appeal.

Pursuant to the Alaska Employment Security Act (the AESA),[1] MarkAir accrued $135,026 in unemployment insurance taxes owed during the first quarter of 1995 (January 1 through March 31). Of this amount, MarkAir withheld $26,578 from its employees' wages. The $108,438 remainder was MarkAir's employer contribution.

MarkAir filed a bankruptcy petition in federal court on April 14, 1995, shortly after the end of the first quarter of the year. Accordingly, all of MarkAir's "cash collateral" was subject to a security interest in favor of Seattle First National Bank (SeaFirst) after April 14.[2] As a result, MarkAir could no longer disburse any funds without SeaFirst's permission.

During a meeting that took place in the period between April 14 and April 28, Hartung and other corporate officers learned that the first quarter taxes had not been paid. This discovery occurred while they were preparing a budget detailing the cash disbursements they thought MarkAir should make. Their proposed budget, which was subject to SeaFirst's approval, included $216,200 in "payroll taxes." Hartung testified that this budget item likely included the $135,026 in unemployment taxes at issue here.

SeaFirst categorically refused to consider any pre-petition payments or obligations. This refusal was reflected in the bankruptcy

---

**1.** AS 23.20.005–.535.

**2.** Although MarkAir had previously filed for protection under federal bankruptcy law in 1992, it appears that this earlier bankruptcy did not affect MarkAir's ability to pay the taxes at issue in this case.

court's April 28 order (apparently drafted by SeaFirst). The order allowed MarkAir to pay certain business expenses, but specifically excluded payment of "any pre-petition debts, including but not limited to state or federal excise, withholding or other tax obligations, except as expressly authorized by the Bankruptcy Court."

Because SeaFirst did not allow MarkAir to pay these tax obligations, the taxes remained unpaid. When the state did not receive MarkAir's scheduled tax payment, it attempted to recover this debt by filing a "proof of claim" in MarkAir's bankruptcy action. Additionally, the Alaska Employment Service issued a notice of assessment against Hartung on October 25, 1995, stating that the Department of Labor had determined that Hartung was "responsible to pay" the $135,026.

Hartung appealed the assessment, but the Department of Labor upheld it after a hearing. Hartung then appealed the Department's decision to the superior court. Hartung filed this appeal after the superior court affirmed the Department's decision.

## III. DISCUSSION

### A. Standard Of Review

■ In this case, the superior court sat as an appellate court reviewing the administrative decision of the Department of Labor.[3] In such cases, we independently review the merits of the administrative determination.[4]

■ This case requires us to interpret the statutory language of AS 23.20.240. We have stated that "[t]he interpretation of a statute presents a question of law."[5] We review questions of law that do not involve agency expertise under the substitution of judgment test.[6] When interpreting a statute we "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[7]

B. *Because Bankruptcy Removed Hartung's Power to Compel Payments, He Is Not Liable for MarkAir's Unpaid Taxes Which Became Due in the Post Petition–Period.*

■ When a corporation liable for unemployment taxes becomes delinquent, the state may institute collection proceedings under AS 23.20.240. That statute both establishes the collection procedure and broadly defines the persons or entities against whom it may be used:

(a) If after notice an employer defaults in the payment of contribution or interest, the amount due may be collected by a person authorized by law and authorized by the department, by civil action in the name of the state, or by both methods.

. . . .

(f) In this section, "employer" as defined in AS 23.20.520 also includes, but is not limited to, an officer or employee of a corporation or a member or employee of a partnership who, as an officer, employee, or member, is under a duty to pay the contributions as required by (a) of this section.

The statute provides for collection from persons other than the delinquent corporation itself. By defining the term "employer" to include certain officers and employees of a corporation, AS 23.20.240(f) allows the state to seek delinquent taxes from those individuals in the corporation who, as a condition of their position, are "under a duty to pay the contributions as required by (a) of this section."

■ In *Breck v. State, Department of Labor*, we interpreted the scope of AS 23.20.240

---

3. *See* AS 23.20.220(c), .445.

4. *See Bruner v. Petersen*, 944 P.2d 43, 47 n. 5 (Alaska 1997) (citing *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992)).

5. *Gossman v. Greatland Directional Drilling, Inc.*, 973 P.2d 93, 95 (Alaska 1999) (citing *Aetna Cas. & Sur. Co. v. Marion Equip. Co.*, 894 P.2d 664, 666 (Alaska 1995)).

6. *See Boyd v. State, Dep't of Commerce & Econ. Dev., Div. of Occupational Licensing*, 977 P.2d 113, 115 (Alaska 1999) (citing *Nyberg v. University of Alaska*, 954 P.2d 1376, 1378 (Alaska 1998)).

7. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

in a consolidated appeal of two collection actions by the state against the officers of two corporations.[8] In those actions, the state sought to collect unpaid unemployment insurance taxes from the officers of two corporations that had failed to pay their respective unemployment taxes.[9] We addressed the circumstances under which corporate officers could properly be held liable for the entire amount of their corporations' unemployment taxes. We held in *Breck* that "personal liability will attach under AS 23.20.240 only to those corporate officers or employees who have significant control over a corporation's finances and who are in a position to see that the corporation pays the taxes owed." [10]

In this case, MarkAir's bankruptcy filing intervened before the taxes became due and before Hartung received notice of default. By the time the taxes became due, the bankruptcy had removed Hartung from being in a position, as CFO, to see that MarkAir paid taxes it owed out of its corporate assets. Because SeaFirst controlled the dispensation of all of MarkAir's assets, and MarkAir could not use any corporate assets to pay debts or obligations without SeaFirst's consent, Hartung no longer had the power to compel MarkAir to pay its tax liability from these assets. Thus, to the extent that Hartung did not have authority to direct MarkAir to pay the taxes it owed, he did not meet the second requirement of the *Breck* test and may not be held liable for MarkAir's unemployment taxes.

■ The conclusion we reach here rests on a narrow exception to officer liability and should not be construed to absolve corporate officers from liability whenever those officers lack the power to cure a default. We hold today that a corporate officer is not liable for payments that become due during the post-petition period and which bankruptcy prevents the officer from effectuating. But the

corporate officer is still liable for all payments that become due during a period in which the officer is in a position to behave strategically. Thus, when the officer is in a position to see that the corporation pays its taxes but fails to do so, that officer is liable for those particular obligations. And if the corporate officer fails to compel payments prior to the bankruptcy petition even though he is in a position to do so, he cannot escape personal liability for those pre-petition obligations.

■ In other words, if the officer exhausts corporate funds during the pre-petition period and fails to effect payment of the withholding taxes, that officer is liable for those obligations even if bankruptcy subsequently prevents payment. But the corporate officer is not liable for payments that become due after the corporation has filed for bankruptcy, and for which bankruptcy law prohibits payment.[11]

■ Thus, courts should examine whether the corporate officer has compelled payments during the period in which the officer was capable of doing so. The corporate officer is not liable for obligations that become due during the post-petition period and for which the bankruptcy court prohibits payment. But the corporate officer is liable for obligations that become due during the pre-petition period which the officer is in a position to effectuate, regardless of whether bankruptcy later prevents the officer from compelling payment.

Applying these standards here, we conclude that Hartung is not personally liable for the $108,438 portion of unemployment insurance taxes that represented MarkAir's employer contribution for the first quarter of 1995. The employer contributions would have to be paid out of corporate assets, they became due during the post-petition period, and the bankruptcy court had prohibited such payments without SeaFirst's express authorization. By the time MarkAir's taxes

---

8. 862 P.2d 854 (Alaska 1993).

9. *See id.* at 855–56.

10. *Id.* at 857.

11. *See accord, Belcufine v. Aloe,* 112 F.3d 633, 634–35, 640 (3d Cir.1997) (where bankruptcy

workout prevented corporate managers from having discretion over payment of benefits, they could not be held liable for not making payments because liability applies "in only those contexts in which the managers have room to behave strategically").

became due, then, Hartung was not in a position to see that the employer contributions were paid.

█ But the same conclusion does not necessarily hold true for the $26,578 portion of taxes representing employee contributions. Alaska Statute 23.20.165(c) treats these contributions as employee assets, not corporate assets, and expressly exempts them from being considered as assets of the employer in bankruptcy. It would thus seem to follow that, despite the bankruptcy order barring unapproved payment of corporate assets, Hartung might have remained in a position to behave strategically to effectuate payment of the employee contributions. Since the Department's decision did not distinguish between employer and employee contributions, however, and because the parties have not adequately addressed this issue in their briefing, we decline to decide it here. Instead, we remand the issue to the Department for further consideration in light of this opinion.

## IV. CONCLUSION

Because the bankruptcy order prevented Hartung from compelling payment of MarkAir's first quarter 1995 unemployment taxes after MarkAir filed for bankruptcy, and because Hartung was not in a position to see that MarkAir paid employer contributions that became due in the post-petition period, Hartung was not a party against whom the tax liability for these contributions could properly be assessed. Nevertheless, Hartung might remain liable for employee contributions under AS 23.20.165(c); but this issue has not been adequately addressed by the parties or the Department. Accordingly, we REVERSE the decision of the Department of Labor and REMAND for further proceedings consistent with this opinion.

CARPENETI, Justice, with whom MATTHEWS, Chief Justice, joins, dissenting.

## I. INTRODUCTION

The chief financial officer for MarkAir failed to pay taxes—representing both em-

1. 862 P.2d 854 (Alaska 1993).

2. *Id.* at 857.

ployee and employer contributions—that were incurred and then withheld by the corporation on wages earned. Because his failure occurred at a time when he had the ability to make the payments and the law imposes liability on individual officers in such circumstances, I would affirm the decisions of the Department of Labor and the superior court holding the corporate officer liable for the unpaid taxes.

## II. DISCUSSION

### A. As Chief Financial Officer of MarkAir, Steven Hartung Was "Under a Duty" To Make the Payments.

Hartung argues that the state cannot collect MarkAir's delinquent contributions from him because his position as MarkAir's CFO did not create a "duty to pay" the taxes.

Hartung, the state, and the court properly look to our decision in *Breck v. State, Department of Labor*[1] for guidance as to when officers may be held personally liable for a corporation's unpaid unemployment taxes. In that consolidated case, we crafted a two-part test to determine when personal liability attaches under AS 23.30.240. Those corporate officers or employees who (1) have significant control over a corporation's finances and who (2) are in a position to see that the corporation pays the taxes owed can be held personally liable.[2] Because Hartung had the power to pay the taxes and failed to do so, he meets both prongs of the *Breck* test and the department's assessment against him was proper.

### 1. Hartung had "significant control" over MarkAir's finances.

The dispute today does not concern the first prong of *Breck*: that Hartung, as CFO, had significant control over MarkAir's finances. Hartung effectively conceded that he meets the first prong of the *Breck* test,[3]

3. In his reply brief, Hartung stated, "[Appellee] seeks to emphasize the fact that appellant ..., while he was MarkAir's 'chief financial officer,'

and the majority does not rest its holding on this prong of *Breck*.

### 2. *Hartung was "in a position to see" that MarkAir paid the unemployment insurance taxes.*

Hartung claims that despite his authority as CFO of MarkAir he was not "in a position to see" that MarkAir paid the taxes because he was "legally precluded" by federal law[4] and court order from causing MarkAir funds to be used to pay the taxes. But Hartung neglects the period before the bankruptcy filing. The record shows that there was a significant period—after the taxes became payable and before MarkAir's bankruptcy filing—during which Hartung could have seen to it that MarkAir paid the taxes.

Further, even assuming that the taxes were not finally due until after the bankruptcy petition was filed (after which MarkAir was forbidden from using its cash collateral to pay any pre-petition debts—including the taxes at issue here—without SeaFirst's permission), the state could properly hold Hartung liable, because the statute imposes strict liability on high corporate officers such as Hartung for their corporations' unpaid unemployment contributions.

### a. *Hartung could have paid the taxes prior to bankruptcy.*

### i. *Employee contributions*

Pursuant to the AESA, employee contributions are deducted by the employer from employees' wages and "*held in trust by the employer* for the commissioner [of labor] until the employee contributions are required by regulation to be deposited with the commissioner."[5] The statute further provides that "[t]hese funds are not subject to garnishment or attachment, and in the event of lien, judgment, or *bankruptcy proceedings are not considered assets of the employer.*"[6]

Accordingly, MarkAir was not barred by federal bankruptcy law from contributing at least this portion of the taxes it owed ($26,578).[7] Neither federal bankruptcy laws in general, nor the bankruptcy court's orders in MarkAir's case in particular, barred MarkAir from forwarding the *employee contributions* to the state. Therefore Hartung—as an employer under AS 23.20.240—can be held liable for MarkAir's failure to forward them.

### ii. *Employer contributions*

While Hartung could have paid the $26,578 in employee contributions to the state, MarkAir's required employer contribution to the unemployment insurance fund ($108,438) remains at issue. But the record shows that there was a significant pre-bankruptcy period during which (1) the contributions were due and (2) Hartung could—in a real-world sense—have caused MarkAir to pay them. Because he failed to do so, his argument that it is inequitable to hold him personally liable for the contributions is unpersuasive. This is especially true because he was acutely aware of the possibility that a failure to see that MarkAir paid the contributions might result in the state holding him personally liable.

The regulation setting forth the time when contributions are due provides:

**5.** AS 23.20.165(c) (emphasis added).

**6.** *Id.* (emphasis added).

**7.** *See Kalb v. United States*, 505 F.2d 506, 509 (2d Cir.1974) (concluding that "withholding taxes are not simply a debt. They are part of the wages of the employee, held by the employer in trust for the government. In paying the taxes over to the government the employer merely surrenders that which does not belong to him. We know of no rule prohibiting such payments by a petitioner under Chapter XI." (internal citation omitted)).

had substantial authority with respect to certain aspects of MarkAir's financial affairs. Hartung has not disputed that fact." Accordingly, this element of the *Breck* test is established. "In the civil arena, a party-defendant is commonly permitted to concede the existence of an element of the plaintiff's claim; the concession removes the element from dispute." *State v. McLaughlin*, 860 P.2d 1270, 1276 (Alaska App.1993).

**4.** *See* 11 U.S.C. § 363(c)(2) (providing that "trustees" such as MarkAir may not "use, sell, or lease cash collateral ... unless—(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section").

Contributions by employers and employees *are due* and shall be paid for each calendar quarter *on or before* the last day of that month which follows the calendar quarter for which contributions have accrued.[8]

The first quarter ended—and the last of the contributions accrued—on March 31, 1995. Therefore, MarkAir's contributions were *due beginning April 1* and had to be paid "on or before" April 30.

MarkAir declared bankruptcy on April 14. After that time, the bankruptcy workout made it impossible for Hartung to cause MarkAir to make the contributions, since SeaFirst refused to allow such payments. However, from April 1 to April 13, Hartung had the ability to compel MarkAir to pay the contributions which were due. Hartung himself testified that "we did have sufficient funds in the bank accounts to [make] the payments," and his authority as CFO to order the payments is unquestioned. As MarkAir's chief financial officer, Hartung had the opportunity to behave strategically in this case: He could have directed that payments be made during the pre-petition period when they were due and during which time he had the power to effectuate the payments.[9] Or he could have declined, or neglected, to do so. Holding him personally liable as a statutory employer is therefore not inequitable.

This conclusion is further supported by Hartung's awareness that he might be held personally liable for the contributions if MarkAir did not pay them. After MarkAir's first bankruptcy filing in 1992, he was personally assessed under an analogous federal statute for unpaid corporate excise taxes. Further, during the administrative hearing on his liability, Hartung testified that he included the pre-petition unemployment taxes in the budget he submitted to SeaFirst because "it was my desire to avoid any possibility of *this particular event* happening." The "particu-

lar event" to which Hartung referred is the department's proceeding against him personally for MarkAir's unemployment taxes. Therefore, it is clear that Hartung was well aware of what personal consequences he might incur from MarkAir's failure to pay the taxes.

Under these circumstances, Hartung was properly held liable for MarkAir's unpaid unemployment contributions.

### b. *Alaska Statute 23.20.240 imposes strict liability on responsible corporate officers.*

Even assuming, as Hartung and the court do, that the taxes were not due until April 30, Hartung can nonetheless be held liable for MarkAir's unpaid taxes.

Hartung argues that the phrase "duty to pay" in AS 23.20.240 should be interpreted to contain a requirement that the corporate officer or employee be found to have "willfully" failed to make the unemployment tax payments on behalf of the corporation before he or she can be held personally liable for them. He analogizes to 26 U.S.C. § 6672(a) and argues that, as federal courts have done under that statute, we should hold that a "voluntary, conscious, and intentional decision by a responsible person not to cause the corporation to pay the taxes with available corporate funds" must be proven before the state can hold an individual officer or employee personally liable.[10] Hartung contends that the superior court's decision wrongfully adopts a "strict liability" standard: "[The superior court's] decision wrongly views persons in corporate financial positions as 'guarantors' of the corporation's contribution payments."

The state argues that Hartung is inappropriately asking that a "willfulness" require-

---

8. 8 AAC 85.030(a) (emphasis added).

9. Hartung, as CFO, also presumably had significant input into the decision making process regarding the making and timing of the petition for bankruptcy.

10. 26 U.S.C. § 6672(a) provides in part:
   Any person required to collect, truthfully account for, and pay over [corporate income tax]

who *willfully* fails to collect such tax, or truthfully account for and pay over such tax, or *willfully* attempts in any manner to evade or defeat any such tax or the payment thereof, shall ... be liable to [sic] a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. (Emphasis added.)

ment in AS 23.20.240 be inserted where none exists. It argues that the obvious intent of the Alaska Legislature in enacting the statute was "to provide a tool to the Employment Security Division to aid it in collecting delinquent taxes from corporate officers and employees by making [them] personally liable for the corporation's tax obligation."

Under Alaska's sliding scale approach to statutory interpretation,[11] AS 23.20.240 holds responsible individuals strictly liable for their failure to see that corporate taxes are paid. The actual wording of AS 23.20.240, the expressed legislative purpose behind it, and the relevant legislative history support this interpretation.

Alaska Statute 23.20.240(a) does not contain any scienter requirement. It provides:

If after notice an employer defaults in the payment of contributions or interest, the amount due may be collected....

Subsection (f) of the statute further provides, "employer" ... includes, but is not limited to, an officer or employee of a corporation or a member or employee of a partnership who, as an officer, employee, or member, is under a duty to pay the contributions as required by (a) of this section.

Hartung would infer a willfulness requirement from the terms "notice" and "duty to pay." Neither of these terms is defined in the definitions section of the AESA.[12] Nor is resort to the dictionary helpful.[13]

The legislature, in sections entitled "purpose" and "policy," laid out its overall goals in enacting the Alaska Employment Security Act. The "purpose" section establishes that the act is to be "liberally construed" to accomplish, among other purposes, "the accumulation of reserves for the payment of com-

pensation to individuals with respect to their unemployment."[14] The "policy" section emphasizes that the public policy of the state is to encourage accumulation of reserves to combat serious social ills.[15] The purpose of the statute and the policy it is designed to effectuate favor the state's construction of AS 23.20.240. Holding Hartung liable is a liberal construction of the statute because it furthers the stated goals of the AESA. This construction increases the accumulation of money in the unemployment insurance fund and may deter other corporate officers from failing to ensure that their corporations pay their contributions.

Although not dispositive, the legislative history generally supports the state's position. The committee files contain an attached section-by-section description of the bill drafted by the Department of Labor[16] which states that the section to become AS 23.20.240(f) was intended to create individual corporate officer liability so as to avoid the loss of contributions to the unemployment insurance program:

Under the existing law the department cannot hold individual corporate officers liable for contributions due. Almost $1,000,000 was declared uncollectible last year [1978] because the department was unable to hold individual corporate officers liable. The proposal comes from the statutes of the Department of Revenue and will allow the unemployment insurance program to protect its tax revenues to the same extent as the Department of Revenue by expanding the definition of "employer" in determining liability in cases of default in payments.[17]

---

11. *See Romann v. State, Dep't of Transp. and Pub. Facilities,* 991 P.2d 186, 190–91 (Alaska 1999) ("We rely ... on a sliding scale approach even if a statute is plainly worded: [S]ince words are necessarily inexact and ambiguity is a relative concept, we ... turn to the legislative history, mindful that the plainer the language, the more convincing contrary legislative history must be.").

12. *See* AS 23.20.520.

13. *See* Black's Law Dictionary 595, 1210–11 (rev. 4th ed.1968).

14. AS 23.20.005(a).

15. *See* AS 23.20.010.

16. *See Homer Elec. Ass'n. v. City of Kenai,* 423 P.2d 285, 289 (Alaska 1967) ("it is an accepted method of determining legislative intent to look to introductory executive messages").

17. 1979 House Finance Committee File HB 214 (Governor's transmittal to the Speaker of the House).

Consonant with the general purpose of the AESA, this proposal places a premium on protecting the state's unemployment insurance fund and does not mention any limits on the department's ability to "hold individual corporate officers liable."

Hartung also argues that the superior court "inappropriately relied on federal cases interpreting a very different federal income tax penalty scheme" in its decision. He cites a United States Supreme Court decision, *Slodov v. United States*,[18] to illustrate this difference. While Hartung is correct that 26 U.S.C. § 6672(a) and AS 23.20.240 differ in important ways, this contrast in fact serves to undermine Hartung's argument.

The *Slodov* court held that the federal statute does not impose strict liability on responsible corporate officers.[19] In support of its holding, the Court highlighted some of the important characteristics of the federal statute.[20]

First, the *Slodov* court pointed out that "the fact that the [federal] provision imposes a '*penalty*' and is violated only by a '*willful failure*' is itself strong evidence that it was not intended to impose liability without personal fault."[21] The AESA, in contrast, "is a *remedial* statute with the primary purpose of ameliorating the negative effects that involuntary unemployment has on both the unemployed individual and society as a whole."[22] As discussed above, AS 23.20.240 does not contain an explicit willfulness requirement. The implication of *Slodov*'s analysis is that the Alaska statute is properly interpreted to impose strict liability.

The *Slodov* court also noted that "Congress, moreover, has not made corporate officers personally liable for the corporation's tax obligations generally, and § 6672 there-

fore should be construed in a way which respects that policy choice."[23] In contrast, the Alaska Legislature *has* chosen to make corporate officers "personally liable for the corporation's tax obligations generally" in AS 43.20.270(q).[24] Thus, holding Hartung liable here would respect the policy choice of the Alaska Legislature in this regard.

Consistent with this view, the "notice" language in AS 23.20.240(a) should be construed to have no more than a literal meaning. It requires that notice be given before collection begins. That requirement applies equally to the actual employer and to officers who have employer status because of their duty to pay under subsection .240(f). It has no impact on this case.

The "duty to pay" language in subsection .240(f) defines officers who are liable as if they were the actual employer. Logically, "duty to pay" has two components. It refers first to the responsibilities of the officer within the corporation. Second, since an officer who is not employed by the corporation during whatever period might be relevant should not be liable, "duty to pay" necessarily has a time component. *Breck*'s discussion casts light on both of these components.

*Breck* speaks of the responsibility component as follows:

> Liability is imposed only if the official has a duty to pay the contributions on behalf of the corporation....
>
> [A] person's "duty" . . . must be viewed in light of his [or her] power to compel or prohibit the allocation of corporate funds. It is a test of substance, not form. Thus, where a person has authority to sign checks of the corporation . . . or to prevent their issuance by denying

---

18. 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978).

19. *See id.* at 254, 98 S.Ct. 1778, 56 L.Ed.2d 251.

20. *See id.*

21. *Id.* (emphases added).

22. *Estes v. Dep't of Labor*, 625 P.2d 293, 295 (Alaska 1981) (quoting *State v. Boucher*, 581 P.2d 660, 662 (Alaska 1978)) (emphasis added) (internal quotation marks and brackets omitted).

23. *Slodov*, 436 U.S. at 254, 98 S.Ct. 1778, 56 L.Ed.2d 251.

24. AS 43.20.270 provides for "distraint on property" of persons who fail to pay state corporate income taxes. Subsection (q) provides: "In this section 'person' includes an officer or employee of a corporation or a member or employee of a partnership, who as an officer, employee, or member is under a duty to perform the act in respect of which the violation occurs."

a necessary signature ... or where the person controls the disbursement of the payroll ... or controls the voting stock of the corporation ... he [or she] will generally be held "responsible." [25]

What the "time" component of the duty to pay requirement consists of is also suggested by the above language. If the officer is in a position to make payroll decisions by signing checks or preventing checks from issuing or otherwise controlling "the disbursement of the payroll," then the officer is liable for the taxes associated with the particular payroll over which the officer has responsibility.

This point is also made in other language in the *Breck* opinion. In discussing both the responsibility and time components of the duty to pay requirements, *Breck* fixes on the accrual date of liability as the time from which the officer's liability is to be measured:

> Breck was the president, chief executive officer, and principal shareholder of Financial Planning *when the taxes accrued.* He had control of and responsibility for corporate accounting and was charged with responsibility for the proper use and application of corporate funds. Finally, Breck was the corporate officer responsible for submitting reports to the ESD. Given these facts, we conclude that Breck had significant control over Financial Planning's finances and is, therefore, personally liable for its unpaid employment security contributions.[26]

The *Breck* opinion actually involved two corporations. In discussing officer liability of the second corporation, the opinion likewise rested on the time of accrual of the tax liability as the temporal measure of officer liability:

> Oakes was the president, director, and majority shareholder of Big Eddies *during the time the taxes accrued.* Oakes was a signatory on the corporate bank account

and made direct payments to creditors. Oakes also signed four of the six quarterly tax reports filed by Big Eddies that went unpaid. Given these undisputed facts, we hold as a matter of law that Oakes had significant control over Big Eddies' finances and was responsible for insuring that these taxes were paid. In other words, *Oakes was "under a duty"* to pay the contributions for the corporation.... [27]

An employer's liability accrues at each payroll when wages are paid.[28] Since Hartung was an officer responsible for disbursement of the payroll at the time that the March 1995 payroll was disbursed, he satisfies both the responsibility and the time components of the "duty to pay" language of subsection .240(f). He therefore should be liable as an employer.

Construing officer liability to attach at the same time that employer liability attaches seems most consistent with the language of subsection .240(f) which equates responsible officers with employers for purposes of imposing liability and does not differentiate between them. Further, as indicated, this is consistent with the legislative purpose which is to hold responsible officers liable for tax payments that their corporations fail to pay. By contrast, when one measures corporate liability from accrual of tax liability—when the payroll is paid—and officer liability from a later "due" date, a loophole is created under which officers may escape liability for their corporation's defaults. Many scenarios can be imagined under which officers will be excused from their payment responsibilities because of events that intervene between the accrual of liability and the due date. One such event, voluntary bankruptcy, is illustrated by this case. Others can include the firing or resignation of the officer and exhaustion of funds by payments to others, or because they are attached, or stolen.[29]

---

25.  862 P.2d at 856, 857 (quoting *Godfrey v. United States,* 748 F.2d 1568, 1576 (Fed.Cir.1984)) (alterations in original).

26.  *Id.* at 857 (emphasis added).

27.  *Id.* (emphasis added).

28.  Both employer and individual contributions accrue "with respect to wages." *See* AS 23.20.165(a) and (b).

29.  See for example, *Laborers Combined Funds of W. Pa. v. Mattei,* 359 Pa.Super. 399, 518 A.2d 1296, 1301 (1986), where officers sought to excuse their liability on the grounds that needed funds were embezzled from their corporation.

I can see nothing in either the language or the history of the statute that suggests that the legislature intended that a responsible officer serving as such when a tax liability accrued should be relieved of liability because of subsequently occurring financial problems making payment impossible. On the contrary, because it knew that such problems would sometimes occur, the legislature made responsible officers liable on the same basis as their employers.

The principle of corporate officer liability is widely accepted in the United States. The consensus among our sister states with statutes like AS 23.20.240[30] is that corporate officers may be held personally liable for the financial obligations of a corporation without a finding of culpability on the individual's part.[31] State courts have found corporate officer liability in a variety of contexts, including unpaid withholding and sales taxes,[32] wages,[33] and corporate debt.[34]

B. *Hartung Was Not Denied Due Process.*

Hartung also argues that holding him personally liable for MarkAir's unemployment taxes violates his due process rights because "[n]othing in [AS 23.20.240], the Department's regulations, any prior decision of the Commissioner, or this Court's decision in *Breck*, even hints that Hartung would be personally liable for MarkAir's first quarter 1995 contribution payment when he had no power to cause that payment to be made."

First, it is clear from the facts set out above that Hartung did have the power during the first two weeks of April—a time after which the entire liability had accrued—to cause the payment to be made.

Second, despite Hartung's considerable attention to his lack of notice claims, the record shows that Hartung himself was actually aware that he might be held liable if MarkAir did not pay its taxes. He cannot now persuasively argue that he was not on notice of the possibility that he might be held liable.

III. *CONCLUSION*

Alaska Statute 23.20.240 was enacted by the legislature with the remedial goal of ensuring that the state—and, more importantly, involuntarily unemployed workers—would not be deprived of revenue because of a corporation's failure to pay its unemployment taxes. The Alaska Legislature ensured that its objective would be achieved by permitting the state to collect delinquent taxes from responsible corporate officers like Hartung.

The record shows that there was a significant period after the taxes came due during which Hartung was in a position to see that MarkAir paid the taxes. He failed to do so. Even assuming that Hartung was prohibited by MarkAir's creditors from paying the taxes, AS 23.20.240 lacks an explicit scienter requirement, and Hartung does not convincingly argue that such a requirement should be read into the statute. Therefore, even if MarkAir was prevented from paying the tax-

The court rejected this variant of an impossibility defense; the officers' "corporate positions exposed them to liability for the corporation's breach" "without reference to any proof of culpability or scienter."

**30.** *See* Colo.Rev.Stat. §§ 8–4–101—8–4–102; Mich. Comp. Laws Ann. § 205.96(5) (corporate taxes); Mich. Comp. Laws Ann. § 205.65(2) (sales taxes); Mich. Comp. Laws Ann. § 206.351(5) (withholding taxes); Minn.Stat. § 270.101; 43 Pa. Cons.Stat. § 260.2a—260.12; Tex. Tax Code Ann. § 111.016(d)(1).

**31.** *See generally* 3A James Solheim & Kenneth Elkins, *Fletcher Cyclopedia on the Law of Private Corporations* § 1264, at 566 & n. 22 (rev. ed.1994). The statutes and cases discussed involve several kinds of taxes, including unemployment, sales, and use taxes. However, the ques-

tion of whether a responsible individual may be held personally liable for corporate debts is independent of the type of tax sought to be collected. Likewise, cases involving individual corporate officers' liability for unpaid wages are relevant as well.

**32.** *See Larson v. Commissioner of Revenue*, 581 N.W.2d 25, 27 (Minn.1998) (withholding and sales taxes); *Stackpoole v. Michigan Dep't of Treasury*, 194 Mich.App. 112, 486 N.W.2d 322 (1992) (withholding and sales taxes); *In re Amber's Stores, Inc.*, 205 B.R. 828, 831 (Bankr. N.D.Tex.1997) (sales taxes).

**33.** *See Cusimano v. Metro Auto, Inc.*, 860 P.2d 532, 533 (Colo.App.1992); *Mohney v. McClure*, 390 Pa.Super. 338, 568 A.2d 682 (1990).

**34.** *See Mattei*, 518 A.2d at 1297–98.

es by its bankruptcy, Hartung cannot escape liability. This result does not deprive Hartung of due process, because he was on actual notice that he might be held liable if MarkAir failed to meet its tax obligations.

Accordingly, I would affirm the decision of the superior court which upheld the department's assessment against Hartung.