**Cynthia WOLD, individually and as Personal Representative of the Estate of Heidi Wold, Appellant,**

v.

**PROGRESSIVE PREFERRED INSURANCE COMPANY, Appellee.**

**No. S–9775.**

Supreme Court of Alaska.

Aug. 2, 2002.

Laurel J. Peterson, Laurel J. Peterson, P.C., Anchorage, for Appellant.

Daniel T. Quinn, Richmond & Quinn, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and BRYNER, Justices.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

Heidi Wold was killed while riding in a pick-up that rolled over after its driver, Koby Smith, swerved to avoid an on-coming car; the on-coming car kept driving and was never identified. Heidi's estate and her parents settled with Smith's insurer; Heidi's mother, Cynthia, then claimed benefits—both individually and as personal representative of Heidi's estate—from Progressive Preferred Insurance Company on Cynthia's own uninsured/underinsured motorists (UM/UIM) policy. Progressive refused to pay and sought a declaratory judgment, claiming that the unknown driver's conduct could not trigger UM/UIM coverage without a collision and that Smith's negligence could not trigger UM/UIM coverage because the Wolds had not exhausted his liability coverage. The superior court entered judgment for Progressive. We affirm in part and reverse in part, agreeing that Alaska law treats unidentified vehicles as uninsured only when there is a collision but holding that Heidi Wold's estate used up Smith's liability coverage and so may claim UM/UIM benefits from Progressive.

## II. FACTS AND PROCEEDINGS

On December 27, 1995, Koby Smith rolled his pick-up truck when he swerved to avoid a car coming toward him in his lane of traffic. Smith's truck did not hit the oncoming car; the car kept driving, and its driver was never identified. Koby Smith's passenger, sixteen-year-old Heidi Wold, was killed in the accident. Heidi's mother was called to the accident scene and arrived soon after, just before Heidi died.

Smith was insured under a policy issued by Allstate Insurance Company that provided both liability° and uninsured/underinsured motorists coverage, each having limits of $100,000 per person and $300,000 per accident. Heidi Wold's mother, Cynthia Wold,

had her own UM/UIM policy with Progressive, which had the same limits as the Allstate policy. It is undisputed that Heidi qualified as an insured person under both the Allstate and Progressive policies.

Through their attorney, Laurel Peterson, the Wolds negotiated with Allstate for payment under Smith's liability and UM/UIM coverages. Cynthia Wold asserted a wrongful death claim as the personal representative of Heidi's estate; on her own behalf, Cynthia asserted a "bystander" claim for negligent infliction of emotional distress (NIED); and both Cynthia and Heidi's father, Greg Wold, evidently asserted individual claims for loss of consortium or society. The Wolds asserted these claims against both Smith and the unknown driver, alleging that each had been negligent. They maintained that Smith was covered for his own negligence under Allstate's liability policy and that, under Alaska law, the unknown driver was considered to be an uninsured motorist whose actions were covered under the policy's UM/UIM provisions.[1]

The Wolds and Allstate reached a settlement on two of their claims in early December 1997. On December 19 Allstate sent Peterson two checks for $135,600, one representing a policy-limits settlement ($100,000 plus costs and attorney's fees) for the estate's wrongful death UM/UIM claim and the other for Cynthia Wold's NIED UM/UIM claim. Both of these claims arose from the unknown driver's alleged negligence. Peterson accepted both checks on behalf of the Wolds.

Meanwhile, two days earlier, on December 17, Peterson had filed a superior court complaint against Smith in order to prevent the Wolds' unresolved claims from being barred under the two-year tort statute of limitations,[2] which otherwise would have expired on December 27. The complaint listed as plaintiffs "Cynthia Wold individually, Cynthia Wold, as Appointed Personal Representative of the Estate of Heidi Wold, and Gary Wold." Over the next two months Allstate and Pe-

---

1. AS 28.20.445(f) and AS 28.22.201(b) both provide, in relevant part, that a vehicle that has left the scene of an accident with an insured vehicle is "presumed to be uninsured if the person insured reports the accident to the appropriate authorities within 24 hours."

2. *See* AS 09.10.070.

terson continued to negotiate on the Wolds' unresolved claims. In February 1998 the Wolds filed a global offer of judgment, proposing to settle all their remaining claims against Allstate and Smith for $100,000 plus costs, interest, and attorney's fees—a total that Peterson calculated to be $137,883.81. Allstate accepted the offer, and on March 4, 1998, it delivered a settlement check to Peterson "in trust for Cynthia Wold, Gary Wold, [and] Cynthia Wold as personal rep of the Heidi Wold Estate," in exchange for the Wolds' release of all claims against Allstate and Smith.

Peterson then sent a demand letter to Cynthia's own insurer, Progressive, asserting that the Allstate policy's limits had now been exhausted and that Cynthia and the estate had a right to further reimbursement under Cynthia's UM/UIM policy with Progressive. Progressive denied any obligation to pay and filed a superior court action seeking declaratory relief. The declaratory judgment complaint offered two reasons to support Progressive's position that it had no legal duty to pay the UM/UIM claims. First, insofar as Cynthia and the estate claimed coverage for injuries caused by the unknown driver's negligence, Progressive asserted that Alaska law precluded the unknown driver from being considered an uninsured motorist "because there was no physical contact between the vehicle driven by Koby Smith and the phantom driver's vehicle." Second, insofar as Cynthia and the estate sought to recover for injuries resulting from Koby Smith's negligence, Progressive asserted that Smith could not be considered an underinsured driver under Alaska law because the Wolds had not used up the policy limits available under Smith's Allstate liability policy.

Following an evidentiary hearing into the circumstances surrounding the Wolds' settlements with Allstate, Superior Court Judge Brian C. Shortell issued findings of fact and conclusions of law sustaining Progressive's position.

Cynthia appeals in her own right and on behalf of Heidi's estate.

## III. DISCUSSION

### A. The Physical Contact Requirement

■ Cynthia challenges the superior court's ruling that Progressive had no duty to pay her claim for UM/UIM benefits arising from the unknown driver's negligence because the unknown driver's car did not collide with Smith's pick-up. Although she acknowledges that Progressive's policy required physical contact, Cynthia argues that this requirement should not have been enforced because it is undisputed that Koby Smith's accident was caused by an unidentified vehicle whose driver failed to stop at the scene of the accident.[3]

But the trial court's ruling enforcing the Progressive policy's physical contact requirement was mandated by Alaska law. In 1984 Alaska's Motor Vehicle Safety Responsibility Act (MVSRA), to which all automobile policies must conform,[4] was amended by the addition of a section relating to uninsured and underinsured motorists coverage. Alaska Statute 28.20.445(f) provides:

If both the owner and operator of the uninsured vehicle are unknown, payment under the uninsured and underinsured motorists coverage shall be made only where direct physical contact between the insured and uninsured or underinsured motor vehicles has occurred. A vehicle that has left the scene of the accident with an insured vehicle is presumed to be uninsured if the person insured reports the accident to the appropriate authorities within 24 hours.[5]

The Alaska Mandatory Automobile Insurance Act (AMAIA) contains similar language. Alaska Statute 28.22.201(b) reads:

If both the owner and operator of a vehicle are unknown, payment under the uninsured and underinsured motorists coverage may be made only where direct contact between the motor vehicles has

---

**3.** Cynthia's argument that the unknown driver was an uninsured motorist presents questions of statutory construction, which we answer using our independent judgment. *See Progressive Ins. Co. v. Simmons*, 953 P.2d 510, 512 (Alaska 1998).

**4.** *Id.* at 522.

**5.** Ch. 70, § 12, SLA 1984 (creating AS 28.20.445).

occurred. A vehicle and operator that have left the scene of an accident with another vehicle are presumed to be uninsured if the insured person reports the accident to the appropriate authorities within 24 hours.[6]

Thus, under both the MVSRA and the AM-AIA an insured can only receive UM/UIM payments for accidents involving an unknown vehicle if there was physical contact between the vehicles.

The UM/UIM coverage in Cynthia's Progressive policy contained a clause that matched these statutory provisions. The Progressive policy defined "uninsured or underinsured motor vehicle" to include:

> a "hit and run vehicle" which strikes an INSURED PERSON, YOUR INSURED CAR, or, in the case of BODILY INJURY, a vehicle which an INSURED PERSON is OCCUPYING which causes BODILY INJURY to an INSURED PERSON or PROPERTY DAMAGE to YOUR INSURED CAR arising from an ACCIDENT where there is physical evidence of contact between the INSURED PERSON or YOUR INSURED CAR and the hit and run vehicle, provided that:
>
> 1) the operator or owner cannot be ascertained at the time of the ACCIDENT and remains unknown,
>
> 2) the INSURED PERSON or someone on his or her behalf shall have reported the ACCIDENT to the appropriate law enforcement agency within 24 hours.

The policy further specified: "If both the owner and operator of the uninsured vehicle are unknown, payment under the Uninsured and Underinsured Motorist Coverage shall be made only where direct physical contact between the INSURED and the UNINSURED or UNDERINSURED MOTOR VEHICLES has occurred."

■ Cynthia concedes that Smith's truck did not physically contact the unknown vehicle and that the literal terms of her UM/UIM policy precluded recovery for the unknown driver's actions. But she nonetheless argues that Progressive's physical contact clause should not be enforced because she offered extrinsic proof "of the presence of the phantom vehicle." Cynthia points out that other courts have been willing to set aside physical contact policy clauses when corroborative evidence demonstrates the presence and responsibility of an unknown vehicle. She argues that we should follow these cases because a physical contact clause serves no useful purpose in these circumstances and enforcing it allows an insurer to breach its duty of good faith and fair dealing.

But Progressive correctly observes that when courts from other jurisdictions have been willing to invalidate physical contact requirements in policy clauses, they have generally done so under statutory regimes that differ from Alaska's. As Widiss explains in his treatise UNINSURED AND UNDERINSURED MOTORIST INSURANCE, although physical contact requirements are a legitimate mechanism for preventing fraud by "foreclos[ing] claims arising from accidents that were allegedly—but not actually—caused by the operation of an unidentified vehicle," [7] many courts have declined to strictly enforce clauses in policies requiring physical contact: "Courts in approximately half the states have concluded that insurers are not entitled to enforce the 'physical contact' requirement because it is in derogation of the uninsured motorist legislation and is therefore void." [8]

Yet almost all of these courts have construed the disputed policy provisions in the absence of a statute that requires physical contact. It appears that only West Virginia has judicially adopted the rule proposed by Cynthia by allowing a claimant to satisfy an express *statutory* physical contact requirement with extrinsic evidence of a "miss-and-run" accident. In *Hamric v. Doe* the West Virginia Supreme Court concluded that "ab-

---

**6.** For the source of this language see chapter 108, section 1, SLA 1989.

**7.** 1 ALAN I. WIDISS, UNINSURED AND UNDERINSURED MOTORIST INSURANCE § 9.2, at 565 (Rev.2d ed.1999); *see also* David J. Marchitelli, Annotation, *Uninsured Motorist Indorsement: Construc-* *tion and Application of Requirement that There Be "Physical Contact" with the Unidentified or Hit-And-Run Vehicle; "Miss-And-Run Cases,"* 77 A.L.R. 5th 319, § 2[a] at 340 (2000).

**8.** 1 WIDISS § 9.7, at 612.

solute enforcement of the physical contact requirement is contrary to public policy" and that "the physical contact requirement should not prevent recovery when there is sufficient independent third-party evidence to conclusively establish that the sequence of events leading to an injury was initially set in motion by an unknown hit-and-run driver or vehicle."[9] But in reaching this decision, *Hamric* simply adopted the reasoning in *Girgis v. State Farm Mutual Automobile Insurance Co.*,[10] an Ohio case decided in the absence of a statutory physical contact requirement.[11]

With the exception of *Hamric*, courts in jurisdictions whose UM/UIM statutes include express physical contact requirements invariably hold that the UM/UIM coverage does not apply in a miss-and-run case—that there must be some actual contact with the unknown vehicle.[12] *Orpustan v. State Farm Mutual Automobile Insurance Co.* exemplifies the reasoning of these courts.[13] There, the California Supreme Court enforced a statutory physical contact requirement despite clear proof that the claim was not fraudulent,[14] concluding that the legislature had made a permissible policy choice in adopting the requirement: "The statute makes proof of 'physical contact' a condition precedent in every case for the recovery of damages caused by an unknown vehicle. There are no exceptions. If it is advisable that the statute be changed, the solution lies within the province of the Legislature."[15]

Here, Cynthia's argument parallels *Hamric*'s public policy analysis. But as mentioned above, *Hamric*'s analysis is unpersuasive because it relies on a case decided in a state that had no statutory physical contact requirement. Cynthia also relies on the Oregon Court of Appeals's decision in *To v. State Farm Mutual Insurance*,[16] which declined to enforce a policy's physical contact clause and, instead, allowed a miss-and-run claim to be " 'corroborated by competent evidence other than the testimony of the insured or any person having an uninsured motorist claim resulting from the accident.' "[17] But *To* reached this decision against the backdrop of a recently enacted statute that had repealed Oregon's former physical contact requirement and replaced it with a corroboration requirement.[18]

Here, by contrast, to accept corroborative evidence as a substitute for physical contact, we would need to override the express terms

9. 201 W.Va. 615, 499 S.E.2d 619, 623–24 (1997).

10. 75 Ohio St.3d 302, 662 N.E.2d 280 (1996).

11. *Hamric*, 499 S.E.2d at 623–24.

12. *See* 1 Widiss § 9.5; Marchitelli, 77 A.L.R. 5th 319, § 4[a]; *see, e.g., Autry v. Nationwide Gen. Ins. Co.*, 948 F.Supp. 615, 619 (S.D.Miss.1996) (applying Mississippi law which contains a statutory physical contact requirement); *Orpustan v. State Farm Mut. Auto. Ins. Co.*, 7 Cal.3d 988, 103 Cal.Rptr. 919, 500 P.2d 1119, 1123 (1972) (in banc) (rejecting the insured's theory that solid evidence that the no-contact accident was caused by the negligence of a phantom driver should satisfy the fraud-prevention statute requiring physical contact as one that could not be judicially adopted); *Texas Farmers Ins. Co. v. Deville*, 988 S.W.2d 331, 333–34 (Tex.App.1999) (interpreting Tex. Ins.Code Ann. art. 5.06–1(2)(d) to limit coverage for accidents caused by unknown vehicles to cases in which there was physical contact between the insured and unknown vehicles); *Mayer v. State Farm Mut. Auto. Ins. Co.*, 870 S.W.2d 623, 624–25 (Tex.App.1994) (same); *Young v. State Farm Mut. Auto. Ins. Co.*, 711 S.W.2d 262, 262–63 (Tex.App.1986) (same); *Hayne v. Progressive N. Ins. Co.*, 115 Wis.2d 68, 339 N.W.2d 588, 590–96 (1983) (determining that statute defining uninsured motor vehicle to include an "unidentified motor vehicle involved in a hit-and-run accident" required actual physical contact between the insured and unidentified vehicles).

13. 7 Cal.3d 988, 103 Cal.Rptr. 919, 500 P.2d 1119 (1972).

14. *See id.* at 1123.

15. *Id.*

16. 123 Or.App. 404, 860 P.2d 294 (1993), *rev'd in part and aff'd in part*, 319 Or. 93, 873 P.2d 1072 (1994).

17. *See To*, 860 P.2d at 295–97 (quoting ORS 742.504(2)(g)).

18. *See id. To* thus implicitly draws a line permitting courts to override physical contact insurance clauses on public policy grounds only in the absence of parallel statutory requirements. Though the facts of this case make it tempting to tilt toward not toeing *To*'s tacit line in toto, to do so, we think, would allot too little deference to legislative prerogatives.

of AS 28.20.445(f) and AS 28.22.201(b). Cynthia thus essentially asks us to nullify a legislative choice on public policy grounds. Yet statutes themselves reflect the state's public policy; hence, we have recognized that "public policy ... cannot override a clear and unequivocal statutory requirement." [19]

■ On their face, Alaska's physical contact statutes are absolute and unambiguous.[20] Yet because Alaska does not follow the plain meaning rule, the plain language of these provisions does not itself end the inquiry.[21] Under Alaska's sliding-scale approach to statutory construction, strong legislative history may support a different meaning.[22] But "[when] a statute's meaning appears clear and unambiguous, ... the party asserting a different meaning bears a correspondingly heavy burden of demonstrating contrary legislative intent." [23]

Here, Cynthia fails to identify any legislative history suggesting that the statutory physical contact requirement was intended to have limited application. Since Cynthia has rested her case on general public policy considerations and has failed to establish any legislative history suggesting that these provisions were meant to have limited application, we find her arguments unpersuasive. Because the Progressive policy's physical contact clause comports with the express requirements of Alaska law, we affirm the superior court's decision precluding Cynthia and Heidi's estate from claiming UM/UIM payments for negligence attributable to the unknown driver.

## B. The Exhaustion Requirement

■■ The superior court determined that by settling for less than the limits of Smith's Allstate liability policy the Wolds failed to exhaust the liability policy; thus, Smith was not an underinsured driver under Alaska's UIM statute, and Cynthia and Heidi's estate were not entitled to payment under Cynthia's Progressive UIM coverage. On appeal Cynthia advances two arguments against this ruling: first, that the Wolds were not required to exhaust Smith's liability; and second, that they actually did exhaust the limits.[24]

The first argument can be readily answered. Alaska's Motor Vehicle Code provides that UM/UIM coverage "may not apply ... until the limits of liability of all bodily injury and property damage liability bonds and policies that apply have been used up by payments or judgments or settlements." [25] In *Curran v. Progressive Northwestern Ins. Co.*, which we issued after the present case

19. *Curran v. Progressive Northwestern Ins. Co.*, 29 P.3d 829, 833 (Alaska 2001).

20. *See* AS 28.20.445(f); AS 28.22.201(b).

21. *See Homer Elec. Ass'n v. Towsley*, 841 P.2d 1042, 1044 (Alaska 1992); *Univ. of Alaska v. Geistauts*, 666 P.2d 424, 428 n. 5 (Alaska 1983); *State v. Alex*, 646 P.2d 203, 208–09 n. 4 (Alaska 1982).

22. *See Progressive Ins. Co. v. Simmons*, 953 P.2d 510, 516 (Alaska 1998); *Geistauts*, 666 P.2d at 428 n. 5; *Alex*, 646 P.2d at 208–09 n. 4; *State, Dep't of Natural Res. v. City of Haines*, 627 P.2d 1047, 1049 n. 6 (Alaska 1981).

23. *Geistauts*, 666 P.2d at 428 n. 5; *see also Homer Elec. Ass'n*, 841 P.2d at 1044.

24. Determining whether the Wolds settled with Allstate for less than the liability limits of the Allstate policy is a question of contract interpretation. *See Leisnoi, Inc. v. Stratman*, 956 P.2d 452, 454 (Alaska 1998); *Singh v. State Farm Mut. Auto. Ins. Co.*, 860 P.2d 1193, 1199 (Alaska 1993) ("It is well established that a settlement is a contract."). The superior court's answer to that contract question was based on evidence relating to the process by which the Wolds settled with Allstate. Because the superior court's decision was made by reconciling conflicting extrinsic evidence, we review to determine whether substantial evidence supports the trial court's interpretation. *See Little Susitna Const. Co. v. Soil Processing, Inc.*, 944 P.2d 20, 23 (Alaska 1997) ("[W]e do not reweigh the evidence but ask only whether it creates room for diversity of opinion among reasonable people."); *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 256 (Alaska 1996) ("[W]here the trial court relies on conflicting extrinsic evidence ... we are 'confined to determining whether the facts support the trial court's interpretation.' ") (quoting *Fairbanks N. Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1025 (Alaska 1986)); *see also Tundra Tours*, 719 P.2d at 1024–25 ("[T]he standard used in reviewing factual findings must be applied where extrinsic evidence is in dispute."); *Jackson v. Nangle*, 677 P.2d 242, 247 n. 4 (Alaska 1984).

25. AS 28.20.445(e)(1). An identical provision appears in AS 28.22.201(a)(1).

had already been briefed and argued, we held that this provision "requires a UIM claimant to 'exhaust' or 'use up' all underlying liability coverage before recovering under a UIM policy."[26] *Curran* governs here and supports the superior court's conclusion that the Wolds were required to use up Smith's Allstate liability coverage before turning to Cynthia's own Progressive UIM policy.

■ Whether the Wolds actually did use up the limits available under Smith's Allstate liability coverage is a harder question to answer. Some additional background is necessary to frame our review of the superior court's findings and conclusions on this issue.

The superior court's ruling that the unknown driver's negligence could not have triggered Progressive's duty to pay under Cynthia's UM/UIM policy left open the question whether Cynthia and the estate might recover UIM benefits attributable to Koby Smith's negligence. As indicated above, the trial court correctly recognized that Alaska's Motor Vehicle Code would not consider Smith to be an underinsured driver for purposes of triggering Progressive's duty to pay UM/UIM benefits until the limits of Smith's Allstate liability coverage "[had] been used up by payments or judgment or settlements."[27] The crucial issue before the superior court thus became whether the three settlement checks that the Wolds had received from Allstate—two in December 1997 and one in March 1998—had "used up" the limits of Smith's liability coverage.

At the evidentiary hearing below, the chief factual controversy centered on what specific legal claims Allstate and the Wolds had settled and what available Allstate policy limits those settlements affected. As mentioned earlier, Koby Smith was insured under an Allstate automobile policy providing two coverages: liability and UM/UIM. The first protected Smith from liability for property dam-

age and bodily injury arising out of his own negligent driving; the second protected Smith and his passengers (including Heidi Wold) against loss resulting from property damage or bodily injury by uninsured or underinsured drivers, including Smith himself once his liability coverage was "used up" by settlement.

Smith's liability and UM/UIM coverages each provided for maximum payments of $100,000 per person and $300,000 per accident. The maximum limits specified for each coverage were independent: a policy-limit liability payment would not reduce the payments available under the UM/UIM policy limits, or vice versa. Furthermore, a person settling for nominal policy limits—$100,000—would be entitled to receive additional compensation from Allstate for attorney's fees and prejudgment interest.

In their early negotiations with Allstate, the Wolds, through their attorney, Laurel Peterson, asserted three distinct types of claims. First, Cynthia Wold asserted a wrongful death claim as representative of Heidi Wold's estate;[28] second, on her own behalf, Cynthia asserted a "bystander" claim for negligent infliction of emotional distress;[29] and third, both parents appear to have individually asserted claims for loss of consortium or society.[30] Allstate regarded the estate's wrongful death claim and Cynthia's NIED claim to be subject to separate "per person" policy limits. Moreover, unlike Progressive, Allstate conceded the unknown driver's status as an uninsured motorist, expressly waiving its right to rely on Alaska's direct physical contact requirement.

In negotiating the Wolds' claims, then, Allstate recognized and accepted that the Wolds were asserting each of their claims against both Smith's liability and UM/UIM coverages: Allstate thus assumed that the estate could potentially recover $100,000 plus add-

---

**26.** 29 P.3d 829, 833 (Alaska 2001) (interpreting AS 28.20.445(e)(1)).

**27.** AS 28.20.445(e)(1).

**28.** *See* AS 09.55.580.

**29.** *See generally Mattingly v. Sheldon Jackson Coll.,* 743 P.2d 356, 365 (Alaska 1987).

**30.** *See* AS 09.15.010; *Gillispie v. Beta Constr. Co.,* 842 P.2d 1272, 1273 (Alaska 1992) (AS 09.15.010 creates parental cause of action for loss of child separate from wrongful death action brought by child's estate).

ons (attorney's fees and interest) on its wrongful death claim under each of Smith's coverages and that Cynthia could potentially recover an additional $100,000 plus add-ons on her bystander NIED claim under each of those coverages. By contrast, Allstate regarded the potential claims for loss of consortium or society to fall under the same "per person" policy limit as the estate's wrongful death claims.

In deciding Progressive's declaratory judgment action, the superior court heard testimony concerning the Allstate settlements from Peterson and reviewed a deposition from Rodney Layton, the Allstate adjuster who negotiated the Wolds' claims with Peterson. The court also reviewed all relevant settlement correspondence. Based on this evidence, the superior court concluded that the two $135,600 checks that Allstate gave to Peterson in December 1997 represented two "per person" policy-limit payments plus add-ons resolving the Wolds' claims against Smith's UM/UIM coverage for injuries arising from the unknown driver's negligence— one check settling the estate's wrongful death claim against that coverage; the other settling Cynthia Wold's separate NIED claim. Thus, the court found, these settlements had no effect on the policy limits available to pay any claims against Smith's liability coverage.

The superior court went on to find that Allstate and the Wolds continued negotiating after reaching the two December 1997 settlements and eventually settled all their remaining liability claims in March 1998 in exchange for Allstate's March 3 payment of $137,833.81. In the court's view, "[t]hese claims included [Cynthia] Wold's individual NIED liability claim, the Estate's liability claim and Gary Wold's [loss-of-society] claim(s)." Since the court had ruled that the December settlements did not use up any of Smith's liability limits, it found that, at the time of the March liability settlement, "the liability portion of the Allstate policy had at least two $100,000 limits still available for the protection of claims against Koby Smith, one

for the estate and one for Cynthia Wold's NIED claim." The court further noted that, "[w]ith add-ons, these two limits would have exceeded $270,000." Because Allstate's payment of $137,833.81 fell well below this total and, in the court's view, represented two distinct liability claims, the court reasoned that the March liability settlement "did not use up the remaining funds available to Cynthia Wold and the Estate from the Allstate liability policy." And since the Wolds had failed to use up Smith's liability limits, the court concluded, "they [were] precluded from pursuing a UM/UIM claim against Progressive based on the liability of Koby Smith."

On appeal, Cynthia insists that the superior court erred in characterizing Allstate's March settlement payment as a settlement resolving her NIED liability claim. Although she argues the point in her opening brief,[31] Cynthia acknowledges in her reply brief that the superior court did not err in ruling that Allstate's December 1997 settlement checks resolved the estate's and Cynthia's separate claims against Smith's UM/UIM policy and therefore used up only the Allstate UM/UIM policy limits. But Cynthia nonetheless insists that upon settling her UM/UIM NIED claim in December, she abandoned that claim, relinquishing her right to assert it as a basis for any further UIM liability payments. Thus, Cynthia reasons, the only claims that remained on the table for settlement after December 1997 were the estate's wrongful death liability claim and the individual liability claims for loss of society— all of which Allstate regarded as accruing to the estate's "per person" liability limit. According to Cynthia, then, the March settlement check must have paid—and must have used up—the policy limits of Smith's liability coverage available to the estate:

> In December, 1997, Allstate had paid [Cynthia] $135,600, whereupon she agreed to waive further NIED claims. With an identical payment to the Estate, Allstate's UM/UIM insurance exposure was fully exhausted. With the final March 8th settle-

---

**31.** Cynthia's opening brief contends, for example, that "[t]he facts show that $135,600, was paid by Allstate to compromise ... Cynthia's NIED claim under the liability provisions of the

Allstate[ ] policy. An additional $135,600, was paid to compromise the Estate's UM claims ... associated with the phantom vehicle."

ment, the Estate had recovered *two* per-person limits[:] one each from Allstate's UM/UIM and liability coverages. [Total $273,433.81] Progressive's UM/UIM coverage was necessarily triggered vis a vis the Estate, the only viable claimant asserting a claim at the time of the March settlement. Demand on Progressive's UM/UIM coverage was made accordingly.[32]

The record supports Cynthia's argument. In his December 12, 1997, letter to Layton accepting Allstate's December 10 offer to settle the estate's and Cynthia's separate UM/UIM claims, Peterson broadly indicated that the settlement would "settle and resolve all future NIED claims" and that "[n]ot at anytime in future litigation will Mrs. Wold be allowed to argue additional damages flowing from her cause of action rights under existing emotional distress claims." By comparison, Peterson was considerably more circumspect in the waiver language he used with respect to the estate's December 1997 wrongful death settlement, stating only that "[n]o further *underinsured motorist claim* can be made by the estate in future litigation." (Emphasis added.)

On December 17, 1997, five days after writing the letter accepting Allstate's offers to settle the two UM/UIM claims, Peterson filed a formal complaint against Smith to preserve the Wolds' liability claims against the statute of limitations. While the complaint expressly asserted the estate's wrongful death claim and the Wolds' individual claims for loss of society, it conspicuously omitted any allegation of a cause of action for NIED by Cynthia Wold. Three days later, on December 21, Peterson wrote Layton a settlement letter, seemingly confirming that Cynthia's entire NIED claim had been resolved: "Please note that we have settled only Mrs. Wold's negligent infliction of emotional distress claim (NIED), as well as the underinsured motorist coverage available to the estate." And on December 27, 1997, the two-year statute of limitations apparently expired on the NIED claim with no cause of action having been filed.[33]

None of Peterson's or Allstate's subsequent settlement correspondence or documents make any reference to any potential or still-pending NIED claim by Cynthia. And in a letter written to Progressive shortly after concluding the March 4, 1998, Allstate settlement, Peterson requested UM/UIM payments under Cynthia's Progressive policy only on behalf of the estate: "Please be aware that the Estate of Heidi Wold has, in fact, resolved its claims against the driver of the vehicle in which Heidi Wold was a passenger shortly prior to her death.... Clearly the maximum liability policy applicable to the estate is less than the damages sustained. Thus, ... I hereby make demand for the full policy limits to be tendered immediately." Furthermore, in a letter to Progressive dated April 21, 1998, Peterson made it clear that Cynthia could not have been claiming UM/UIM payments from Progressive for NIED based on Smith's conduct, since Cynthia claimed only to have exhausted Allstate's UM/UIM coverage on her NIED claim and made no similar claim of exhaustion with respect to Allstate's liability coverage for NIED:

> Please note that the estate settled with Allstate for the full and complete UM/UIM coverage in December 1997. Thereafter, in March the estate settled the full liability claim for a maximum liability coverage available. Also, you will note that we settled with Allstate on the full and complete coverage of Mrs. Wold's underinsured motorist claim also in December.

In summary, then, the record seems to contain no evidence indicating that Cynthia Wold ever asserted or purported to assert an NIED liability claim against Allstate based on Smith's conduct after she successfully settled her NIED UM/UIM claim in December. To the contrary, Peterson consistently professed to have abandoned any such claim, omitted it from the Wolds' formal complaint against Smith, and allowed the claim to expire under the statute of limitations as of December 27, 1997. Thus, although Layton testified as to his subjective belief that the Wolds' March 1998 global settlement and

---

**32.** (Record cites omitted.)

**33.** *See* AS 09.10.070.

release included a settlement of Cynthia Wold's unresolved NIED liability claim, the record fails to establish that this belief was reasonable: as of March 1998, the Wolds were not asserting or threatening to assert against Allstate or Smith Cynthia's NIED liability claim; and it appears that the possibility of any legally colorable NIED liability claim no longer existed.

Because we find no justification for concluding that Allstate's March 4 settlement encompassed a pending or potential claim for NIED asserted or assertable against Smith's Allstate liability policy by Cynthia Wold, we hold that it was error for the trial court to conclude the settlement used up a portion of a separate "per person" liability policy limit attributable to such a claim.

But this conclusion does not fully answer whether Allstate's settlement payments used up the liability coverage available to the estate under Smith's policy. Allstate's March 4, 1998, global settlement agreement with the Wolds resolved not only the estate's wrongful death claim against Smith's liability policy, but also the individual claims for loss of society that Cynthia and Gary Wold set out in their complaint. If those claims triggered separate "per person" limits under Smith's liability policy, then any payments allocated to the loss-of-society claims would not have reduced the coverage available to pay the estate's wrongful death claim; hence, the estate would not have used up its available "per person" limits of Smith's liability policy.

Because we have not previously decided whether a *Gillispie*[34] loss-of-society claim can trigger a separate "per person" policy limit, we requested the parties to file supplemental briefing on this issue. In its supplemental briefing, Progressive argues that the Wolds' claims for the loss of their daughter's society were subject to the same "per person" limit in the Allstate liability policy as Heidi's estate's wrongful death claim. Progressive bolsters its argument by discussing case law from other jurisdictions, which generally seems to hold that all consequential damages flowing from bodily injury to a single person fall within a one per-person limit.[35]

We find it unnecessary to resolve the issue definitively here.[36] In the present case, it

---

34. *Gillispie v. Beta Constr.*, 842 P.2d 1272 (Alaska 1992).

35. Progressive identifies *Gonzales v. Allstate Ins. Co.*, 122 N.M. 137, 921 P.2d 944 (1996), *Spaur v. Allstate Ins. Co.*, 942 P.2d 1261 (Colo.App.1996), and *Medley v. Frey*, 660 N.E.2d 1079 (Ind.App. 1996), as demonstrating that other courts interpreting similar policy language hold that emotional damage to a survivor is not a separate bodily injury triggering a second unit of coverage.

36. Indeed, the issue may not be amenable to a definitive resolution, since much of the case law cited by the parties in their supplemental briefing seems to suggest that whether a loss-of-society claim should trigger separate "per person" coverage may hinge more on a particular policy's definition of the scope of its bodily injury coverage than on the inherent nature of a cause of action for loss of society. *Compare, e.g., Abellon v. Hartford Ins. Co.*, 167 Cal.App.3d 21, 212 Cal. Rptr. 852, 854–55 (1985); *Employers Cas. Ins. Co. v. Foust*, 29 Cal.App.3d 382, 105 Cal.Rptr. 505, 508 (1972); *Giardino v. Fierke*, 160 Ill. App.3d 648, 112 Ill.Dec. 559, 513 N.E.2d 1168, 1173 (1987); *Williamson v. Historic Hurstville Ass'n*, 556 So.2d 103, 107 (La.App.1990); *Valliere v. Allstate Ins. Co.*, 324 Md. 139, 596 A.2d 636, 638 (1991) (holding that although loss of consortium or other service was not a "bodily injury" within meaning of usual policy language, policy in question specifically defined term "bodily injury" to include loss of services and insurer was bound by that definition); *Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 607 A.2d 1255, 1261 (1992); *Wolfe v. State Farm Ins. Co.*, 224 N.J.Super. 348, 540 A.2d 871, 873–74 (App.Div. 1988); *Lavanant v. Gen. Accident Ins. Co. of Am.*, 79 N.Y.2d 623, 584 N.Y.S.2d 744, 595 N.E.2d 819, 822 (1992) (concluding that "bodily injury" defined in a property insurance policy as "bodily injury, sickness, disease or death" was ambiguous); and *Allstate Ins. Co. v. Handegard*, 70 Or. App. 262, 688 P.2d 1387, 1388–89 (1984), *with Spaur v. Allstate Ins. Co.*, 942 P.2d 1261, 1263 (Colo.App.1996); *Medley v. Frey*, 660 N.E.2d 1079, 1080–81 (Ind.App.1996); *Allstate Ins. Co. v. Diamant*, 401 Mass. 654, 518 N.E.2d 1154, 1156 (1988) ("The term 'personal injury' is broader and includes not only physical injury but also any affront or insult to the reputation or sensibilities of a person. 'Bodily injury,' by comparison, is a narrow term and encompasses only physical injuries to the body and the consequences thereof."); *State Farm Mut. Auto. Ins. Co. v. Descheemaeker*, 178 Mich.App. 729, 444 N.W.2d 153, 154–55 (1989); *Gonzales v. Allstate Ins. Co.*, 122 N.M. 137, 921 P.2d 944, 946–47 (1996); and *Richie v. Am. Family Mut. Ins. Co.*, 140 Wis.2d 51, 409 N.W.2d 146, 147–48 (App.Ct. 1987) (distinguishing between personal injury and bodily injury).

**166**

appears that Rodney Layton, the Allstate claims adjuster who settled the Wolds' claims, took the same position as Progressive, viewing a claim for loss of consortium or society—as opposed to a claim for NIED—as a derivative claim that would not trigger a separate "per person" Allstate policy limit. Given that Layton and Progressive both agree on the proper treatment of the loss-of-society claims under Smith's Allstate policy, we find no reasonable basis in this case for allocating any portion of the March 4 global settlement attributable to Cynthia and Greg Wold's individual loss-of-society claims to a separate "per person" policy limit than the limit covering the estate's wrongful death claim. And because the claims for wrongful death and loss of society are the only specific liability claims that the Wolds were still asserting when they negotiated the global settlement, it follows that Allstate's March 3 settlement payment exhausted the limits of the liability coverage available to Heidi Wold's estate under Smith's Allstate policy.

For this reason, we hold that it was error to declare that the estate had failed to use up Smith's Allstate liability coverage and was barred from asserting a UM/UIM claim against Progressive.[37]

## IV. CONCLUSION

We AFFIRM the superior court's ruling on the physical contact issue, REVERSE its ruling on the estate's exhaustion of the Allstate liability coverage, and REMAND for entry of judgment in conformity with this opinion.

CARPENETI, Justice, not participating.

---

**37.** Because we have limited our decision to the propriety of allocating the Wolds' loss-of-society settlement to separate "per person" limits under the Allstate policy, we express no view as to the proper handling of these individual claims under the specific terms of Progressive's UM/UIM policy—an issue that the parties have not addressed and that we think should properly remain open for consideration by the superior court in the first instance, if it arises.