Colleen COUGHLIN, Appellant,

v.

GOVERNMENT EMPLOYEES
INSURANCE COMPANY
(GEICO), Appellee.

No. S–10072.

Supreme Court of Alaska.

April 18, 2003.

Rehearing Denied June 9, 2003.

Allen Vacura, Stepovich Law Office, Fairbanks, for Appellant.

Susan D. Mack and Mark E. Wilkerson, Wilkerson & Associates, Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

Colleen Coughlin received a $10,000 payment for medical expenses for injuries she sustained in a two-car accident. Her insurance company, by terms of the insurance policy, acquired a lien on any recovery Coughlin obtained from the other driver. Coughlin settled with the other driver's insurance company for $40,000 and assumption of responsibility for payment of the $10,000 for medical coverage. Coughlin asserted she had exhausted the $50,000 facial limit of the other driver's policy and that she could therefore draw upon her own underinsured motorist coverage. Coughlin's insurance company claims that she failed to exhaust the policy limits of the other driver's insurance. We conclude that Coughlin did exhaust the policy limits of the other driver's insurance policy and therefore reverse the superior court's grant of summary judgment in favor of Coughlin's insurance company.

## II. FACTS AND PROCEEDINGS

Colleen Coughlin was injured in an automobile accident in August 1993. She was insured by Government Employees Insurance Company (GEICO), and the driver of the other car, Kevin Babosky, was insured by Colonial Insurance. Babosky's policy had a facial limit of $50,000 per person. Coughlin's policy covered $10,000 in medical payments and $50,000 in underinsured motorist coverage (UIM). GEICO paid Coughlin $10,000 for medical expenses, resulting in a medical lien against any recovery Coughlin made.

Coughlin filed suit against Babosky and offered in April 1996 to settle the case for the policy limits of $50,000, plus attorney's fees and prejudgment interest. Babosky rejected the offer and the parties settled on different terms later that year. Under the terms of the settlement, Coughlin released Babosky and Colonial from all liability in exchange for $40,000 "and the assumption of responsibility for the subrogation claim of Geico Insurance Company, in the amount of TEN THOUSAND DOLLARS." Before signing the settlement agreement, Coughlin's attorney faxed a letter to a GEICO claims adjuster, Colrain Ingersoll, on July 3, 1996 asking for GEICO's consent to Coughlin's settlement with Colonial. The letter stated that Coughlin was "receiving policy limits from Colonial [of] $50,000." Ingersoll signed the consent request from Coughlin and faxed it back to Coughlin's counsel on July 10, 1996. Coughlin then signed the settlement agreement with Colonial on July 12, 1996.

GEICO settled its subrogated claim for Coughlin's medical expenses with Colonial for $5,000. It is unclear from the record on what date this claim was settled, though the claims representative for GEICO stated she believed the claim was settled "several months" before Coughlin settled with Colonial. However, a letter from counsel for Colonial dated July 5, 1996 implies that the matter was as of that time unresolved by stating that "Colonial has agreed to address the Geico lien directly."

Coughlin sent a letter to GEICO in March 1998 requesting that it pay $50,000 under Coughlin's underinsured motorist coverage. The letter asserted that Colonial had paid its policy limits of $50,000 and requested attorney's fees and interest from GEICO. GEICO denied any underinsured motorist payment, claiming that Coughlin did not receive policy limits from Colonial because she settled for $40,000 and GEICO settled for $5,000 for the medical lien, totalling only $45,000 on a facial limit of $50,000. GEICO responded that even if Colonial had paid $50,000, Coughlin still would not have received policy limits because she did not receive attorney's fees or interest. GEICO maintained that Coughlin should have known that Alaska law defined policy limits to include attorney's fees and interest because

Coughlin requested those add-ons in her letter to GEICO requesting the underinsured motorist payment.

Coughlin filed suit against GEICO in August 1999, alleging bad faith and fraud and seeking damages under the underinsured motorist provision of her policy. In September 2000 both sides moved for summary judgment. Coughlin argued that Ingersoll's consent letter established that Coughlin received policy limits from Colonial. Coughlin further argued that GEICO could not then avoid underinsured motorist liability by setting its subrogated claim for less than the face value of the medical lien and that if GEICO settled for less just to avoid underinsured motorist payment, it acted in bad faith. GEICO opposed Coughlin's motion.

GEICO argued in its motion for summary judgment that Coughlin did not settle for policy limits with Colonial because she only received $45,000 on a liability limit of $50,000. GEICO further argued that Coughlin did not settle for policy limits because she did not receive prejudgment interest or attorney's fees. GEICO asserted that counsel for Coughlin knew from experience that the subrogated $10,000 medical lien would settle for less than that amount. Coughlin responded that she was not told of GEICO's settlement with Colonial, that the settlement of the medical lien occurred after Coughlin's settlement with Colonial, and that the settlement she reached with Colonial—for $40,000 plus responsibility for GEICO's $10,000 medical lien—constituted policy limits.

The superior court, Judge Charles R. Pengilly presiding, granted GEICO's motion for summary judgment. The court held that even if Coughlin had received $50,000 from Colonial, she did not settle for policy limits because this amount did not include the attorney's fees that Colonial otherwise would

have had to pay. The court advised that if Coughlin was confused about what the policy limit would be she should have pursued a declaratory action. The court posited that it was "common knowledge" that insurance companies do not resolve claims based on medical liens for the face value of the lien and that Coughlin should have known that she was settling for much less than $50,000. The court also concluded that Ingersoll's signature on the consent letter was not an acceptance of Coughlin's agreement with Colonial as one for policy limits. Rather, the court held that her signature only allowed Coughlin to pursue excess coverage; it was not a commitment to provide such coverage. Finally, the court stated that such commitment, even if it were found to exist, was based on misrepresentations by Coughlin because she never actually received policy limits from Colonial. As a result, the court refused to allow her to characterize the settlement in such a way as to be eligible for additional recovery. Coughlin appeals the grant of summary judgment.

## III.  DISCUSSION

### A.  Standard of Review

■■■ We review a grant of summary judgment de novo.[1] We apply our independent judgment to questions of statutory interpretation,[2] adopting the rule of law "that is most persuasive in light of precedent, reason, and policy."[3] When reviewing statutory interpretation, we apply a sliding scale in which "[t]he plainer the meaning of the language of the statute, the more convincing any contrary legislative history must be."[4]

### B.  Coughlin Settled for the Full Policy Limits.

■■■ The parties do not dispute that AS 28.20.445(e)(1)[5] requires a claimant to ex-

---

1. *Cabana v. Kenai Peninsula Borough,* 50 P.3d 798, 801 (Alaska 2002).

2. *Tesoro Petroleum Corp. v. State,* 42 P.3d 531, 535 (Alaska 2002); *Progressive Ins. Co. v. Simmons,* 953 P.2d 510, 512 (Alaska 1998).

3. *Progressive,* 953 P.2d at 512 (quoting *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

4. *Curran v. Progressive Northwestern Ins. Co.,* 29 P.3d 829, 831–32 (Alaska 2001).

5. AS 28.20.445(e)(1) provides:
   (e) Uninsured and underinsured motorists coverage
   (1) may not apply to bodily injury, sickness, disease, or death of an insured or damage to or destruction of property of an insured until the limits of liability of all bodily injury and prop-

haust the underlying liability policy limits before pursuing underinsured motorist benefits.[6] What is in dispute is whether Coughlin received policy limits from Colonial. Repeating its argument before the superior court, GEICO asserts that Coughlin did not exhaust Babosky's policy limits because Colonial only paid out $45,000. GEICO argues alternately that Colonial's "actual" policy limit exceeded $50,000 because Colonial was required to pay costs, interest, and attorney's fees and Coughlin received none of these. We reject both of these arguments. We hold both that Coughlin exhausted Colonial's policy limits when she received $40,000 in cash plus Colonial's agreement to assume responsibility for her $10,000 medical lien and that costs, interest, and attorney's fees are not to be included in determining whether policy limits have been exhausted for the purpose of drawing upon underinsured motorist coverage.

### 1. The subrogated medical lien

In exchange for signing a settlement releasing Babosky and Colonial from future legal liability, Coughlin received $40,000 in cash from Colonial and Colonial agreed to assume responsibility for GEICO's subrogated $10,000 medical lien. GEICO at some point settled this medical lien with Colonial for $5,000. As a result, Colonial in actuality only paid out $45,000 on Coughlin's claim against Babosky.

According to AS 28.20.445(e)(1), uninsured and underinsured motorist coverage cannot be drawn upon "until the limits of liability of all bodily injury and property damage liability bonds and policies that apply have been used up by payments, judgments or settlements." In *Curran v. Progressive Northwestern Insurance Co.*, we interpreted this statute to mean that the insured must " 'ex-

haust' or 'use up' all underlying liability coverage before recovering under [an underinsured motorist] policy." [7] GEICO argues that *Curran* defeats Coughlin's claim because Coughlin did not exhaust her underlying liability coverage and thus cannot draw on her underinsured motorist policy.

But neither fact pattern in *Curran*, a consolidation of two cases, resembles the present case. In the first fact pattern in *Curran*, the injured party, who suffered serious injuries in a single-vehicle accident while riding as a passenger with her husband, offered to give both her own insurance company and that of her husband a $50,000 "credit" against her claims prior to seeking underinsured motorist coverage.[8] But because this proposed "credit" was not a settlement, judgment, or payment from her husband's insurer, we held that the injured party had not satisfied the requirements of AS 28.20.445(e)(1).[9] In the second fact pattern addressed in *Curran*, the injured party in a two-vehicle accident was offered a $60,746.03 settlement for a $50,000 insurance policy[10] by the insurance company for the driver of the other car.[11] The injured party refused this settlement offer but eventually settled for $25,000.[12] This amount was far less than the policy limits and consequently precluded the applicability of underinsured motorist coverage.[13] *Curran*, therefore, is of little assistance in resolving the present issue other than to affirm that policy limits must be exhausted before underinsured motorist coverage can be drawn upon.

The present case does not involve Coughlin offering GEICO a credit against her underinsured motorist coverage, whereby she would be able to draw upon her underinsured motorist coverage but reduce her recovery by the amount necessary to exhaust her other

---

erty damage liability bonds and policies that apply have been used up by payments, judgments or settlements.

6. *Curran*, 29 P.3d at 833.

7. *Id.*

8. *Id.* at 830.

9. *Id.* at 834–38.

10. The settlement amount included a base payment of $40,000 and an additional $20,746.03 for prejudgment interest and attorney's fees. *Id.* at 831 n. 3.

11. *Id.* at 831.

12. *Id.*

13. *Id.* at 835.

claims. We held in *Curran* that this would defeat the purpose of AS 28.20.445(e)(1) because it would "allow a UIM claimant like Curran to bypass the liability insurer altogether and effectively use UIM coverage as primary insurance." [14] Coughlin, however, is making no such attempt here. Coughlin settled her claim for what to her was worth $50,000—a $40,000 payment plus payment of the $10,000 medical lien. GEICO claims that the $10,000 medical lien was only worth $5,000 because that is what GEICO settled for with Colonial. However, Coughlin cannot be held responsible for what GEICO ultimately does with the claim. GEICO was under no obligation to settle the claim for $5,000 and could have chosen to pursue the full amount in litigation if necessary.

Furthermore, it is unlikely that Coughlin could have settled for more than the combined $40,000 payment and $10,000 medical lien. The facial limit of the Colonial policy was $50,000. The superior court concluded that Coughlin, through her legal counsel, should have known that the medical lien would settle for less than face value because this is common knowledge. But even if true, there is no reason to believe that Colonial would have offered to settle for a $45,000 payment and assumption of responsibility for payment of the $10,000 medical lien, which according to GEICO's reasoning would have resulted in a final payout of $50,000. In effect, the reasoning of the superior court would discourage settlements, a result we wish to avoid,[15] by preventing the assumption of liens as part of a settlement agreement. The ultimate value of the lien cannot be known definitively beforehand, and insurance companies are unlikely to settle claims for potentially more than the face value of the policy limits in the hope that they will be able to settle the assumed lien for less than its stated amount.

While it is true that Coughlin could have settled with Colonial for a single payment of $50,000 and then herself paid GEICO the $10,000 reimbursement for the medical payments GEICO made through its policy with her, there is nothing legally requiring Coughlin to do this. The parties reaching the agreement cannot be expected to settle for what would be more than the face value of the policy if the terms of the settlement were fully enforced and collected. The value of the settlement to both Coughlin and Colonial was $50,000 at the time the settlement agreement was reached; that is the measure by which to determine whether Coughlin has exhausted the face value of the Colonial policy.

### 2. Policy limits do not include prejudgment interest and attorney's fees for the purpose of drawing upon underinsured motorist coverage.

GEICO argues that even if Coughlin did settle for $50,000, this is less than her full policy limits because it does not include attorney's fees and prejudgment interest which, GEICO contends, would raise Coughlin's actual policy limits well above $50,000. In support of this argument, GEICO relies on cases in which we have held that insurers who contract to pay all litigation costs are required therefore to pay Alaska Civil Rule 82 attorney's fees and prejudgment interest.[16] While the cases that GEICO cites do

---

**14.** *Id.*

**15.** *Anchorage Sch. Dist. v. Anchorage Daily News,* 779 P.2d 1191, 1193 (Alaska 1989) ("We recognize the important public policy served by those measures which encourage settlement."); *Interior Credit Bureau, Inc. v. Bussing,* 559 P.2d 104, 106 (Alaska 1977) ("Stipulations and settlements are favored in law because they simplify, shorten and settle litigation without taking up valuable court resources.").

**16.** It should be noted that it is unclear from the record and from the trial proceedings below if payment of prejudgment interest was included in Colonial's insurance contract with Babosky, that

being the insurance contract which Coughlin would need to exhaust before she could draw upon her underinsured motorist coverage from GEICO. As we held in *Farquhar v. Alaska National Insurance Co.,* the inclusion of prejudgment interest in policy limits is dependent upon the contractual terms of the insurance policy. 20 P.3d 577, 580–81 (Alaska 2001); *see also Schultz v. Travelers Indem. Co.,* 754 P.2d 265, 267 (Alaska 1988) ("In determining what constitutes the maximum limits of insurance coverage, i.e., policy limits, it is necessary for the court to review the contractual obligations undertaken by the insurer in the insurance policy in question in light of the applicable statutes, regulations and court opinions which have addressed this is-

support this proposition,[17] they are not dispositive of the present case. The cases cited by GEICO and the dissent do not purport to interpret the statutory meaning of "policy limits"; they simply consider what meaning the term should be given in a particular contractual setting—that is, for purposes of determining the amount that an insurer must tender to satisfy an insured's unqualified demand for "policy limits."

We have considered items such as attorney's fees and prejudgment interest to be in addition to the *face* amount of policy limits.[18] They can be considered incorporated into overall policy limits to the extent that insurance companies are legally obligated to pay them, but they do not necessarily bear on the question of whether "limits of liability ... have been used up" for purposes of AS 28.20.445(e)(1).

■ We conclude that the term "limits of liability" as used in the statute refers to facial coverage, and not extras. In reaching this conclusion we look to the purpose of the statute: to ensure that UIM coverage is secondary rather than primary coverage while at the same time making the benefit of UIM coverage broadly available.[19]

Given the dual purposes of AS 28.20.445(e)(1), it is difficult to believe that the legislature would use the term "limits" in a sense that would engender litigation and uncertainty in many cases. In such cases as *Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin,* "policy limits" is a concept that describes the maximum amount that an insurance company would have to pay under a policy if it went to trial and received an adverse verdict.[20] But the amount of policy limits under this definition is sometimes a guess—as where attorney's fees are a percentage of the expected verdict rather than a percentage of the facial coverage—and it would be unlikely that the legislature in enacting AS 28.20.445(e)(1) would have intended to incorporate such an uncertain concept in a context where the purpose is not maximization of coverage but the establishment of a definite and readily ascertainable threshold.[21]

sue."). Because we hold that prejudgment interest is not included in the policy limits for the purpose of determining if policy limits had been exhausted, this issue is moot and need not be addressed upon remand.

17. *See Safety Nat'l Cas. Corp. v. Pacific Employers Ins. Co.,* 927 P.2d 748, 751 (Alaska 1996) ("Under Alaska law it is established that primary policy limits include, among other things, facial limits and attorney's fees taxed under Rule 82, to the extent of coverage."); *Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin,* 828 P.2d 745, 768 n. 58 (Alaska 1992) ("[T]he term 'policy limits' is self-explanatory even without any prior cases. Policy limits necessarily are what an insurance company would have to pay under its policy if it went to trial and received an adverse verdict."); *Schultz,* 754 P.2d at 267 ("[P]olicy limits ... include[ ] the amount of attorney's fees which would have been awarded had this case gone to trial.").

18. In describing a settlement offer in *Curran,* we stated that "a $20,746.03 additional payment for prejudgment interest and attorney's fees ... would not have counted against the policy limit." 29 P.3d at 831 n. 3.

19. The dissent argues that no relevant conceptual difference exists between UIM and excess coverage. Dissent at 995. However, the statute's concern with making UIM coverage widely available distinguishes it significantly from excess coverage. Excess coverage insures against "cat-

astrophic loss." *Safety Nat'l Cas. Corp. v. Pacific Employers Ins. Co.,* 927 P.2d 748, 750 n. 1 (Alaska 1996). UIM coverage, unlike excess coverage, does not contemplate extreme or unusual circumstances, but rather exists to compensate an injured insured "to the extent that the tortfeasor's liability insurance coverage is insufficient to compensate the injured person fully for his or her loss." *Curran v. Progressive Northwestern Ins. Co.,* 29 P.3d 829, 832 (Alaska 2001).

20. 828 P.2d 745, 755 n. 20 (Alaska 1992) (citation omitted).

21. The dissent contends that language in the Motor Vehicle Safety Responsibility Act supports its argument that extras must be exhausted to trigger UIM coverage. Dissent at 993–995. Specifically, the dissent looks to AS 28.20.070(a) and AS 28.20.440(b)(2). These sections prescribe the required amount of insurance that each driver in Alaska must carry. We recognize that both sections contain the language "exclusive of interest and costs" in imposing Alaska's mandatory minimum limits. But we do not agree that the absence of such qualifying language in AS 28.20.445(e)(1) compels the conclusion that the phrase "limits of liability" means all "amounts potentially payable under all the liability coverages of any underlying liability policy." Dissent at 993. Alaska Statutes 28.20.440(b)(2) and 28.20.070(a) define the bare limits of mandatory coverage. Both statutes state explicitly that the mandatory minimum policy limits are "ex-

Indeed, there are strong policy reasons for not including attorney's fees and prejudgment interest in the determination of whether policy limits have been satisfied for the purpose of invoking underinsured motorist coverage. As with the ultimate value of liens, the monetary value of attorney's fees and prejudgment interest is quite speculative. Until the matter is concluded, it may be difficult if not impossible to determine what attorney's fees and prejudgment interest will be. We are wary of starting a new litigation industry centered on disputing attorney's fees for settlement agreements and making sure that no dime is left on the table. This would unjustifiably hinder settlement negotiations by virtually eliminating the possibility of certainty that one has settled for the full face value of one's policy limits. We therefore hold that a policy limit is exhausted for the purposes of invoking underinsured motorist coverage when the full face value of the policy is paid through "payments, judgments or settlements,"[22] regardless of how payment of attorney's fees and prejudgment interest is resolved. The dissent believes that this ruling will "burden the wrong people" by transferring to the UIM insurer the expenses of defending the alleged tortfeasor and challenging the plaintiff's damages claims.[23] Consequently, according to the dissent, UIM coverage will become more expensive.[24] We do not anticipate this result. If the plaintiff sustained injuries in excess of the face value of the tortfeasor's policy, that excess remains regardless of whether the plaintiff received attorney's fees and prejudgment interest.

Thus, we hold that the policy limits are exhausted when the face value of the policy is paid to the insured; any payment or nonpayment of attorney's fees and prejudgment interest is independent of this determination.

clusive of interest and costs." In similarly plain language, AS 28.20.445(e)(1) refers to "bodily injury" and "property damage" limits but not to the extras that can constitute elements of policy limits in other contexts.

**22.** AS 28.20.445(e)(1).

**23.** Dissent at 998.

**24.** Dissent at 999.

## IV. CONCLUSION

In summary, as a matter of statutory construction, "limits of liability of all bodily injury . . . policies," as that phrase is used in AS 28.20.445(e)(1), refers only to the face amount of coverage. Moreover, Colonial, when it agreed to pay Coughlin $40,000 in addition to assuming responsibility for the $10,000 GEICO medical lien, used up the $50,000 face amount of the policy. Accordingly, we REVERSE the grant of summary judgment and REMAND for proceedings consistent with this opinion.

EASTAUGH, Justice, dissenting.

EASTAUGH, Justice, dissenting.

**A. Introduction.** I respectfully disagree with Part III.B.2 of the court's opinion. It holds that payment of the "face value" of Kevin Babosky's policy exhausted his liability coverages, satisfying AS 28.20.445(e)(1) for purposes of invoking Colleen Coughlin's underinsured motorist (UIM) coverage.[1] It consequently holds that exhaustion did not require payment of the "add-ons" which Babosky's liability coverages also covered.[2] This holding is contrary to the result subsection .445(e)(1) requires. I will first explain how we should resolve the issue and then explain my disagreement with the court's analysis.

**B. How We Should Decide this Issue.** This case poses a practical question important to insurers and their injured insureds: What triggers the underinsured motorist coverage, requiring the UIM insurer (here, GEICO) to pay? Alaska Statute 28.20.445(e)(1) answers that question: The UIM insurer must pay after "the limits of liability of all bodily injury . . . liability . . . policies . . . have been used up."[3]

**1.** Op. at 992. There is no claim that GEICO's policy terms are more favorable to Coughlin than subsection .445(e)(1).

**2.** Op. at 992.

**3.** AS 28.20.445(e)(1) provides in pertinent part:
(e) Uninsured and underinsured motorists coverage
(1) may not apply to bodily injury, sickness, disease, or death of an insured or damage to or

What do the legislature's unqualified words "limits of liability" mean? Read in isolation by ignoring companion sections in AS 28.20, they could have two different theoretical meanings. They could mean the amounts potentially payable under all the liability coverages of any underlying liability policy. This is the meaning I think they have. Or they could mean the facial (or numerical) limits specified in the declarations of any underlying policy.[4] This is the meaning the court gives them in this case. Our job is to determine the meaning the legislature gave them.[5]

We need not guess. Subsection .445(e)(1) is part of the Motor Vehicle Safety Responsi-

bility Act. Nearby passages in that act reveal the meaning the legislature intended. Alaska Statute 28.20.070(a) specifies the mandatory minimum numerical limits applicable to automobile liability policies effective in Alaska. It requires each policy to have "a limit, exclusive of interest and costs, of not less than $50,000 because of bodily injury...."[6] Similarly, AS 28.20.440(b)(2) specifies mandatory minimum "limits exclusive of interest and costs" of $50,000 for a vehicle owner's liability insurance policy.[7] Both subsections specify the mandatory minimum facial, or numerical, limits automobile liability policies must have in Alaska.

---

destruction of property of an insured until the *limits of liability* of all bodily injury and property damage liability bonds and policies that apply have been used up by payments, judgments or settlements....
(Emphasis added.)

**4.** I use a qualifier, such as "facial" or "numerical," with "limits" or "policy limits" to refer to the numerical liability limits specified in the policy's declarations.

The court's opinion uses these and equivalent qualifiers for the same purpose. It therefore speaks of the "$50,000 'facial limit,'" (Op. at 987), the "face value of the Colonial policy," (*id.* at 990), "the *face* amount of policy limits," (*id.* at 991), "facial coverage," (*id.*), "full face value of one's policy limits," (*id.* at 992), and "full face value of the policy." (*id.*). (Although we have sometimes used "face value" when referring to the facial limits of liability policies, the concept of "value" seems better suited to describing life and property loss coverages.)

This practice is consistent with our past use of qualifying words or descriptive phrases when we refer only to the numerical limits, *see, e.g., State Farm Mut. Auto. Ins. Co. v. Harrington,* 918 P.2d 1022, 1025–26 (Alaska 1996) ("numerical facial limit"; "facial limits"; "facial policy limits"); *Hughes v. Harrelson,* 844 P.2d 1106, 1108 (Alaska 1993) ("minimum policy limits"); *Tucker v. United Servs. Auto. Ass'n,* 827 P.2d 440, 441 (Alaska 1992) ("base liability limit"); *Wold v. Progressive Preferred Ins. Co.,* 52 P.3d 155, 162 (Alaska 2002) ("nominal policy limits"), or when context makes our meaning clear, *e.g., Curran v. Progressive Northwestern Ins. Co.,* 29 P.3d 829, 830, 831, 835 n. 35 (Alaska 2001) ("policy limit of $50,000 per person"; "$50,000 policy limits"; "facial policy limits plus applicable add-ons").

These qualifiers are necessary because we have consistently used the unqualified phrase "policy limits" to include all liability coverages. *See, e.g., Farquhar v. Alaska Nat'l Ins. Co.,* 20 P.3d 577, 580–81 (Alaska 2001) ("We found that 'poli-

cy limits' meant the facial limit of the policy, plus Rule 82 attorney's fees.") (quoting *Schultz v. Travelers Indem. Co.,* 754 P.2d 265, 267 (Alaska 1988)).

**5.** *Curran,* 29 P.3d at 831; *Baker v. State,* 30 P.3d 118, 118 (Alaska App.2001).

**6.** AS 28.20.070(a) provides:

A policy or bond is not effective under AS 28.20.060 unless it is issued by an insurance company or surety company authorized to do business in this state, except as provided in (b) of this section, and if the accident resulted in bodily injury or death, unless the policy or bond is subject to a limit, exclusive of interest and costs, of not less than $50,000 because of bodily injury to or death of one person in any one accident and, subject to the same limit for one person, to a limit of not less than $100,000 because of bodily injury to or death of two or more persons in any one accident, and if the accident has resulted in injury to, or destruction of, property to a limit of not less than $25,000 because of injury to or destruction of property of others in any one accident.

**7.** AS 28.20.440(b)(2) provides:

The owner's policy of liability insurance must
....
(2) insure the person named and every other person using the vehicle with the express or implied permission of the named insured, against loss from the liability imposed by law for damages arising out of the ownership, maintenance, or use of the vehicle within the United States or Canada, subject to limits exclusive of interest and costs, with respect to each vehicle, as follows: $50,000 because of bodily injury to or death of one person in any one accident, and, subject to the same limit for one person, $100,000 because of bodily injury to or death of two or more persons in any one accident, and $25,000 because of injury to or

The legislature's choice of terminology controls here. When the legislature meant to refer to the facial policy limits, as it did in subsections .070(a) and .440(b)(2), it did not use the unqualified words "limit," "limits," or "limits of liability." Instead, in subsection .070(a) it qualified "limit" with the phrase "exclusive of interest and costs." And in subsection .440(b)(2) it qualified "limits" with the same phrase. The legislature must have been aware of its own usage. Section .445 immediately follows section .440. There would have been no reason to use those phrases to qualify "limit" or "limits" in subsections .440(b)(2) and .070(a) if the legislature intended its unqualified words "limit," "limits," or "limits of liability" to mean only the facial policy limits.[8] Had the legislature intended the words "limits of liability" in AS 28.20.445(e)(1) to refer only to the facial limits of underlying insurance, it would have used the same qualifying phrase it used elsewhere in the Motor Vehicle Safety Responsibility Act when it meant to specify the facial limits. That it did not demonstrates that it meant the unqualified words "limits of liability" in subsection .445(e)(1) to refer to all amounts payable under a policy's liability coverages, and not just its facial limits.

We recently summarized our approach to statutory construction in an opinion that considered whether policyholders had exhausted the underlying liability limits of an insurance policy:

> We apply a sliding scale approach to statutory interpretation: to determine the meaning of a statute we look to its legislative history, even if its language is plain on its face. But "the plainer the meaning of the language of the statute, the more convincing any contrary legislative history

must be." When a statute's meaning appears clear and unambiguous, the party urging another meaning "bears a correspondingly heavy burden of demonstrating contrary legislative intent." We decline to "modify or extend a statute where the statute's language is clear and the legislative history reveals no ambiguity." [9]

Applying that approach, we must apply the language of the statute as written. We begin with analysis of the language of the statute.[10] Statutory context, revealed in subsections .440(b)(2) and .070(a), confirms the meaning the legislature intended.

Further, reading "limits of liability" in AS 28.20.445(e)(1) to mean the same thing as "limits exclusive of interest and costs" in AS 28.20.440(b)(2) or "limit, exclusive of interest and costs" in AS 28.20.070(a) conflicts with our rule of statutory construction under which we give effect to all words of the statute and render none superfluous.[11] Reading the unadorned phrase in subsection .445(e)(1) to refer only to facial limits makes superfluous the qualifying words in subsections .440(b)(2) and .070(a).

No legislative history suggests that the legislature meant something different. Nothing brought to our attention outweighs the plain meaning of the legislature's words. Nor, for reasons I will discuss in the next part, do the legislative purposes permit a contrary reading. Instead, two precepts of Alaska's approach to UIM confirm the reading the plain statutory language requires.

First, the requirement that policies contain underinsured motorist coverage reflects what this court has described as "Alaska's current

---

destruction of property of others in any one accident. . . .

8. The legislature used similar terminology in AS 28.22, the Mandatory Motor Vehicle Insurance Act. Thus, AS 28.22.101(d) requires in part that a motor vehicle liability policy be subject to "limits exclusive of interest and costs" of "$50,000 because of bodily injury to or death of one person." AS 28.22.201(a)(1) provides that underinsured motorists coverage required by Chapter 22 "does not apply to bodily injury . . . until the limits of liability bonds and policies that apply have been used up by payments or judgments or settlements."

9. *Curran,* 29 P.3d at 831–32 (footnotes omitted).

10. *Bullock v. State, Dep't of Cmty. & Reg'l Affairs,* 19 P.3d 1209, 1214 (Alaska 2001); *Gerber v. Juneau Bartlett Mem'l Hosp.,* 2 P.3d 74, 76 (Alaska 2000).

11. *Louisiana–Pacific Corp. v. State, Dep't of Revenue,* 26 P.3d 422, 427 (Alaska 2001); *Kodiak Island Borough v. Exxon Corp.,* 991 P.2d 757, 761 (Alaska 1999); *Romann v. State,* 991 P.2d 186, 190 (Alaska 1999); *Fancyboy v. Alaska Village Elec. Coop.,* 984 P.2d 1128, 1133 (Alaska 1999); *Rydwell v. Anchorage Sch. Dist.,* 864 P.2d 526, 528 (Alaska 1993).

excess approach."[12]  We have stated that this approach is

> premised upon the idea that the injured person is entitled to recover under his or her own underinsured motorist coverage to the extent that the tortfeasor's liability insurance coverage is insufficient to compensate the insured person fully for his or her loss, subject only to the limits of the underinsured motorist coverage.[13]

We described the purpose of Alaska's excess UIM approach as follows: "Excess coverage thus strives to provide additional coverage, as needed to fully compensate injured motorists, after available liability coverage has been completely exhausted."[14]  Classifying UIM coverage as "excess" confirms that all underlying liability coverages, including coverage for any "add-ons," must be exhausted.  In dealing with primary-excess coverage disputes, we require complete exhaustion of underlying primary liability coverages, including liability coverage add-ons, before the excess coverage comes into play.[15]  There is no conceptual difference relevant here between excess coverage and UIM coverage.

The court states that UIM and excess coverage disputes are distinguishable.  It asserts in support that the UIM statute's "concern with making UIM coverage widely available distinguishes it significantly from excess coverage," that "excess coverage insures against catastrophic loss," and that "UIM coverage, unlike excess coverage, does not contemplate extreme or unusual circumstances."[16]  In my view, these assertions do not support the distinction the court draws.  The noted "concern" is only one of several principles underlying Alaska's current UIM statute.  Other principles—treating the UIM coverage as excess, requiring exhaustion of the underlying coverages, and aiming for full compensation—refute the proposed distinction and outweigh whatever relevance the availability principle may have here.  And excess coverage is not extraordinary or limited to catastrophic claims.  It is simply the coverage purchased to cover claims exceeding the primary coverage.  It is routinely available to consumers, who may, for economic reasons, carry minimum primary limits and use excess coverage to extend their limits.  Given that motor vehicle accidents can easily generate non-catastrophic claims exceeding the primary limits, excess insurance is not limited to "extreme or unusual circumstances."[17]  It has the same ultimate purpose as UIM coverage: to satisfy the claims of an injured victim to the extent the tortfeasor's underlying liability coverage is insufficient to compensate the victim fully.[18]

Second, it is anomalous to speak of "complete exhaustion" in terms of "full compensation"[19] unless the injured claimant is truly being compensated for the loss of use of the money damages suffered at the moment of injury, and for the costs, including attorney's fees, of obtaining that compensation.  The concept of making the claimant whole to the extent of the available coverage has driven this court to reason that prejudgment interest is part of compensatory damages[20] and therefore part of the maximum limits of a policy that covers prejudgment interest.[21]  It has likewise driven this court to hold that a policy's coverage of the plaintiff's litigation

---

12.  *Curran*, 29 P.3d at 832.

13.  *Progressive Ins. Co. v. Simmons*, 953 P.2d 510, 517 n. 6 (Alaska 1998).

14.  *Curran*, 29 P.3d at 832.

15.  "Only when the primary insurer's limits are exhausted do obligations on the part of the excess insurers arise.  Under Alaska law it is established that primary policy limits include, among other things, facial limits and attorney's fees taxed under Rule 82, to the extent of coverage."  *Safety Nat'l Cas. Corp. v. Pacific Employers Ins. Co.*, 927 P.2d 748, 751 (Alaska 1996) (citations omitted).

16.  Op. at 991 n. 19.

17.  *Id.*

18.  *Cf. Curran*, 29 P.3d at 832 quoted above in the text.

19.  *Cf. Curran*, 29 P.3d at 832 (describing purpose of UIM coverage as coverage needed to "fully compensate" after liability coverage has been "completely exhausted").

20.  *Guin v. Ha*, 591 P.2d 1281, 1287 (Alaska 1979).

21.  *Tucker*, 827 P.2d at 441.

costs awardable against the insured is a *liability* coverage an insurer must tender when making a "policy limits" settlement offer.[22] Our past decisions require the conclusion that "full compensation" is not achieved for purposes of triggering UIM coverage under subsection .445(e)(1) unless all applicable underlying liability coverages have been paid.

This interpretation of the statute is also compelled by our past treatment of similar terms in insurance policies. Policies often cover not only an insured's liability for tort damage awards, but also an insured's liability for additional awards, such as for costs and interest. We refer to such coverages as "add-ons" that must be added to a policy's numerical limits.[23] Add-ons are part of a policy's liability coverage. An insurer must therefore pay them to pay "policy limits"— the maximum amount the policy would cover if judgment were entered against the insured at trial.[24] Because a judgment would include these additional awards, the limits of a policy covering liability for these additional awards are not exhausted until the coverages for the insured's exposure for these additional awards are exhausted too. These coverages are part of the "limits of liability."

Colonial's "limits of liability" consequently include everything Colonial would have had to pay had a judgment been entered against its insured after trial. It is undisputed that Colonial's policy covered Babosky not only for liability for damage awards, but also for liability for prejudgment interest, attorney's

fees, and cost awards, and that with the add-ons, Colonial's liability coverage substantially exceeded the policy's $50,000 facial limits.[25] No one claims that Colonial paid more than $50,000. Colonial therefore did not exhaust its "limits of liability" per subsection .445(e)(1) for purposes of implicating GEICO's UIM coverage.[26]

**C. The Court's Opinion.** Because the opinion implicitly concludes that the legislature's words do not resolve the exhaustion question, it embarks on an avoidable analytical voyage. It then arrives in the wrong port. The opinion first translates the legislature's words into the court's words, but then chooses not to give those words the meaning we have given them in equivalent insurance disputes. It bases this choice in reliance on its perception of public policy and the legislature's purposes. The statute's clarity precludes reliance on those interpretive aids, but I think the court's policy and purpose assessment is incorrect in any event. The court ultimately reads "limits of liability"—the controlling words in AS 28.20.445(e)(1)—to include no liability coverages except the facial policy limits.[27] I disagree with each stage of the court's approach.

**1. The statute's words.** Because the opinion does not recognize or enforce the distinctions the legislature drew, it does not give the legislature's words the meaning intended. I discussed this proposition above.

**2. The court's words.** The court's opinion substitutes its words for the legislature's,

**22.** *Harrington,* 918 P.2d at 1025–26; *Schultz v. Travelers Indem. Co.,* 754 P.2d 265, 267 (Alaska 1988).

**23.** *Curran,* 29 P.3d at 835 n. 35.

**24.** *Wold,* 52 P.3d at 162–63; *see, e.g., Tucker,* 827 P.2d at 440–41 & n. 3.

> An insurance carrier's agreement to settle a claim for "policy limits" obligates the company to pay its maximum potential liability available under the policy....
>
> ....
>
> ... Whether the disputed coverage involves the base liability limit, court costs, or prejudgment interest, it is the insured's total *potential* liability which is of concern to the insured in a "policy limits" settlement.

*Tucker,* 827 P.2d at 440–41.

**25.** GEICO asserts on appeal that the parties do not dispute that Colonial's policy covered prejudgment interest, costs, and attorney's fees. Coughlin does not dispute this assertion, and represents that "had she held out for fees and interest," her recovery from Colonial would have been about $67,750. According to a demand Coughlin made on GEICO, the Rule 82 add-on for a $50,000 policy would be $7,500.

**26.** I agree with the court's resolution of the medical lien issue in Part III.B.1., but my conclusion that Colonial's limits were not exhausted would moot the lien issue.

**27.** Op. at 992 ("We therefore hold that a policy limit is exhausted for the purposes of invoking underinsured motorist coverage when the *full face value* of the policy is paid...." (Emphasis added.) The court's footnote to that passage cites subsection .445(e)(1).).

translating the statute's words into "policy limits."[28] This substitution obscures the need to focus on the legislature's words, and forces the opinion to try to explain why "policy limits" means something different in UIM coverage cases than in other insurance exhaustion contexts. It also results in a public policy analysis that is unsupported by the words the legislature used.

But if we are going to ignore the effect of the legislature's qualifying words, our past decisions should guide us. There is no logical or functional difference between this case and our policy limits cases. Both deal with this central question: what must the tortfeasor's insurer pay to exhaust its policy limits (or, in the statute's words, the "limits of liability")? We should answer the question the same way in both contexts.

The cases discussed above hold that the policy limits of a liability policy are not exhausted unless liability coverages for add-ons are also paid. Our usage is also instructive. When we wish to speak of the numerical limit set out in a liability policy's declarations, we have qualified our words to make our meaning clear.[29]

The court here uses similar qualifiers to make its meaning clear.[30] That it must do so when it intends to exclude coverage for add-ons illustrates the incongruity of reading subsection .445(e)(1)'s unqualified phrase as though the legislature qualified it.

**3. Public policy and legislative purposes.** The opinion relies on public policy and the court's perception of the purposes underlying UIM coverage to justify its choice not to follow our policy limits cases.[31] This reliance is unwarranted.

Public policy and legislative purposes are inherently weak interpretative aids. There is no need to resort to them when the statute's words are so clear. They are especially unhelpful here because they do not speak specifically to the narrow issue before us. At best, they reflect broad considerations which do not explain what the statute means in this specific context. At worst, they reflect the court's own projections about what the legislature must not have intended,[32] and its own expressions of public policy not voiced by the legislature.[33] Relying on public policy seems particularly chancy here, given that the result—allowing partial exhaustion to trigger the UIM coverage—is inconsistent with the legislature's express words and purposes.

Concerns about possible delays do not justify ignoring the statute's words. More significant disputes about the underlying coverage (whether exclusions apply, for example) would not justify triggering the UIM coverage. Disputes over coverage for add-ons will occasionally delay exhausting the underlying liability limits, but I doubt that they will unduly delay UIM claims. First, a liability insurer with a good-faith interest in litigating a coverage dispute about add-ons can "exhaust" the policy limits by agreeing to pay whatever the court will require when it resolves the add-ons dispute.[34] This agreement has the effect of exhausting the limits, whatever they prove to be, triggering UIM coverage. A liability insurer has incentive to enter into such an agreement to avoid bad faith claims. And if the liability insurer is engaging in bad faith in a policy limits situation, the UIM insurer relies at its peril on the liability insurer's recalcitrance.[35] Further, no difficulty in determining the extent

28. Op. at 988–89, 990–92.

29. *See* cases cited *supra* note 4.

30. *See supra* note 4.

31. Op. at 991–92.

32. *See, e.g.,* Op. at 991 ("it is difficult to believe that the legislature would use"; "it would be unlikely that the legislature … would have intended").

33. *See, e.g.,* Op. at 992 ("there are strong policy reasons").

34. This appears to have been the practice followed in *Schultz v. Travelers Indem. Co.,* 754 P.2d 265, 266–67 (Alaska 1988).

35. Insistence on actual payment may expose an excess insurer to a bad faith claim for anticipatorily repudiating its contract. *Cf. Grace v. Ins. Co. of N. Am.,* 944 P.2d 460, 467 & n. 15 (Alaska 1997) ("[The excess insurer's] duty was triggered when Bell became liable for sums in excess of INA's lower coverage limit, rather than when the underlying limits were actually paid.").

and amount of add-ons coverage has prevented us from treating the add-ons as something an insurer must pay to maximize the liability coverage it owes its insured. We have assumed that this total figure is "quantifiable" and have imposed on the insurer a duty to tender a specific amount to discharge policy limits.[36] And indeed, a UIM claim may have to await a liability and damages trial on the plaintiff's claims against the tortfeasor. Only then will it be known whether the tortfeasor was actually underinsured.

The court supposes that a statutory purpose of "making the benefit of UIM coverage broadly available" supports its reading of the statute.[37] It is not apparent how disputes about the underlying insurer's obligations could reduce the availability of UIM coverage. If a claim is worth more than the underlying limits of liability, there is little chance in a given case the UIM coverage will not be implicated.[38] A social policy of making UIM coverage more readily available would not justify reading the statute to say something it does not. The court also states that "it is difficult to believe" that the legislature might use terminology that would "engender litigation and uncertainty in many cases."[39] Perhaps so, but this general speculation cannot justify a reading contrary to the statute's words. There is no reason to think the legislature intended to adopt a different standard for exhaustion than we have adopted.

The court also expresses concern about the uncertainty of determining policy limits. It recognizes that this "is sometimes a guess" and "is quite speculative."[40] It is "wary of starting a new litigation industry."[41] But an existing litigation industry already stands prepared to dispute every aspect of personal injury claims.

In short, the court draws a bright line which the legislature did not draw. And it does so assuming that full exhaustion carries detriments with it. That is not a public policy choice open to us, given the words of the statute.

**4. Marginal benefit.** The result benefits Coughlin by allowing her to make a UIM claim, but the social benefits the court anticipates are hypothetical or improbable, and will likely be outweighed by the detriments.

First, I think the harm to the purpose of exhaustion outweighs any possible prejudice to UIM coverage. The legislature chose an excess UIM approach.[42] The court's reading of the statute is inconsistent with making excess coverage available to fully compensate injured motorists "after available liability coverage has been completely exhausted."[43] The underlying coverage has not been exhausted. The result may mean that the claimant will never be made whole for loss of use of her prospective damages award or costs and fees incurred in recovering from the underlying insurer. And requiring UIM insurers to compensate plaintiffs prematurely may reduce recalcitrant underlying insurers' exposure to liability for excess judgments and bad faith claims. If so, it would deprive personal injury plaintiffs of their main tool in seeking policy limits settlements from the tortfeasors' insurers.

Second, I predict that the result will burden the wrong people. It will burden purchasers of underinsured motorists coverage (which will now be more easily implicated) and benefit tortfeasors who purchase liability coverage (whose insurers will now have less need to pay add-ons if the claimant has a UIM insurer to pursue). It may transfer from the alleged tortfeasor's insurer to the

**36.** *E.g., Bohna v. Hughes, Thorsness, Gantz, Powell & Brundin,* 828 P.2d 745, 768 (Alaska 1992).

**37.** Op. at 991.

**38.** Coughlin's demand letter to her UIM insurer alleged total losses exceeding $150,000. She asserts on appeal her damages exceeded $172,000.

**39.** Op. at 991.

**40.** Op. at 991, 992.

**41.** Op. at 992.

**42.** *Curran v. Progressive Northwestern Ins. Co.,* 29 P.3d 829, 832 (Alaska 2001).

**43.** *Id.*

UIM insurer the expense of defending the other driver and challenging the plaintiff's damages claims. If so, it will make UIM coverage more expensive, again at the expense of the parties who are not at fault.

**D. Conclusion.** In short, I think the superior court correctly analyzed this issue. I would therefore affirm.